UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCHES | ) | Mag. Nos. 24-1278 through 24-1285 |
| OF SEVERAL LOCATIONS | ) | |
| | ) | **[UNDER SEAL]** |

## AFFIDAVIT/APPLICATION FOR SEARCH WARRANTS

I.      **Introduction**

A.      **The Drug Trafficking Investigation and the Indictment**

I, Ryan J. Chrobak, a Special Agent with the Federal Bureau of Investigation, being duly sworn, state as follows:

Search warrants for the following locations are being sought as part of an investigation of a drug trafficking organization (referred to as "the Organization" or "the DTO") operating in New Castle/Lawrence County in Western Pennsylvania as well as in Detroit/Michigan and Youngstown/Ohio.  Many of the subjects of the investigation are part of a close-knit crew who are connected through family and friendship and have been convicted of felony crimes in the past.  The investigation has revealed that members of the DTO are involved in acquiring kilograms of fentanyl/heroin and cocaine/crack, as well as other controlled substances such as oxycodone, from interstate sources of supply. The investigation has further revealed that members of the DTO are serving as significant sources of supply for other drug dealers throughout Lawrence County and beyond.

The investigation resulted in the approval of a federal indictment by a grand jury in the Western District of Pennsylvania in July 2024.  The indictment charges conspiracy to distribute at least 400 grams of fentanyl, 5 kilograms of cocaine, 100 grams of heroin, and a quantity of oxycodone, from August 2023 to July 2024.  The indictment charges each of

the following defendants with committing that crime: CHRISTIAN FRIERSON, DEVAIL ADAMS, CHRISTOPHER BARTON, PATRICK BROWN, ROY BROWN, FRANK CHRISTIAN, TYRONE DAVIS, EDWARD DIETRICH, ALEXIS DONNELL, DEDRIC HIGGINBOTHAM, KIARA JONES, QUINTEN JONES, KENNETH KING, JERMAINE LETT, MARCUS MASON, DANIEL RASNICK, KENDRA SAGER, JAUAN SEARCY, and GEORGE WYATT.

**B.      Search Locations (and Vehicle)**

The following are the locations for which search warrants are being sought:

(1) **Western District of Pennsylvania / 1105 Highland Ave, Apt 1, New Castle, PA / "Highland Ave Location":** This location is a multi-family house, with tan siding on the exterior, and a parking area behind the house adjacent to an alleyway in the rear. The apartment door is located on the first floor of the rear of the house.  This location is Christian FRIERSON's residence in the WD/PA.

(2) **Western District of Pennsylvania / 219 E Lincoln Ave, Top Unit, New Castle, PA / "E Lincoln Top Location":** This location is a multi-family house, with brown siding on the exterior, and a gravel parking area behind the house adjacent to an alleyway in the rear. The Top Unit is accessed by an internal set of steps that leads to a third-floor landing area. This location is the residence of Devail ADAMS and Kiara JONES in the WD/PA.

(3) **Western District of Pennsylvania / 219 E Lincoln Ave, Bottom Unit, New Castle, PA / "E Lincoln Bottom Location":** This location is a multi-family house, with brown siding on the exterior, and a gravel parking area behind the house adjacent to an alleyway in the rear. The Bottom Unit is accessed through

a door at the rear of the house beneath an internal set of stairs leading to additional floors. This location is Christopher BARTON's residence in the WD/PA.

(4) **Western District of Pennsylvania / 912 Harrison St, New Castle, PA / "Harrison St Location":** This location is a single-family house with tan and brown siding on the exterior. The front door faces Harrison Street. The number "912" is posted on a pillar that faces Harrison Street. The Lawrence County Property Assessment Website, which has been demonstrated to be reliable in this and other investigations, lists Jason GLASS as the current owner of this location with a mailing address of 912 Harrison St, New Castle, PA 16101. This is GLASS's residence in the WD/PA.

(5) **Western District of Pennsylvania / 1222 Randolph St, New Castle, PA / "Randolph St Location":** This location is a single-family house with multiple outbuildings located on the property. The main house has yellow siding and a covered front porch. The number "1222" is on the trim of the front porch. Adjacent outbuildings have light-colored siding. The Lawrence County Property Assessment Website, which has been demonstrated to be reliable in this and other investigations, lists Edward DIETRICH as one of the current owners of this location with a mailing address of 1222 Randolph St, New Castle, PA 16101. This is DIETRICH's residence in the WD/PA.

(6) **Western District of Pennsylvania / 1152 11th St, W Pittsburg, PA / "11th St Location":** This location is a single-family house, with light grey siding, and a shingled roof. The front door faces 11th Street. The number "1152" can be

observed to the right of the front door. This is the residence of George WYATT in the WD/PA.

(7) **Western District of Pennsylvania / Hyundai Genesis Assigned PA License Plate MJT-1183 / "Hyundai Genesis":** This vehicle is registered to Reteammea Nelson, 3 W Home St, New Castle, PA 16101. This vehicle is used by George WYATT.  As demonstrated herein, WYATT frequently traffics narcotics and uses this vehicle in doing so.

(8) **Western District of Pennsylvania / 626 Forrest St, New Castle, PA / "Forrest St Location":** This location is a single-family house with white vinyl siding. The front door has a wooden ramp leading to it and is covered by a small roof. The number "626" is adjacent to the front door which faces Forrest Street. Patrick BROWN has recently been residing at this location in the WD/PA.

(9) **Eastern District of Michigan / 8064 Pressler St, Detroit, MI / "Pressler St Location":** This location is a single-family house with a brick exterior. Above the front door is a covered front porch with a landing. George WYATT uses this location in the ED/MI to further the activities of the DTO.

(10) **Eastern District of Michigan / 531 W Hildale Ave, Detroit, MI / "Hildale Ave Location":** This location is a single-family house, with brick siding, a partially gated driveway, and a detached garage. The number "531" is located to the right of the front door which faces Hildale Avenue. Dedric HIGGINBOTHAM resides at this location in the ED/MI.

(11) **Eastern District of Michigan / 33661 Sebastian Ln Dr, Sterling Heights, MI / "Sebastian Dr Location":** This location is a single-family house with

brick and light-colored siding. There is an attached garage, with the number "33661" above the garage door, and a fence enclosing a back yard. Dedric HIGGINBOTHAM uses this location in the ED/MI to further the activities of the DTO.

(12) **Eastern District of Michigan / 19800 Salisbury St, St Clair Shores, MI / "Salisbury St Location":** This location is a single-family house with an attached garage. The house has light-colored siding and a shingled roof. The number "19800" is on the north-facing side of the house, toward Salisbury Street. This location is Jermaine LETT's residence in the ED/MI.

(13) **Eastern District of Michigan / 14060 Linnhurst St, Detroit, MI / "Linnhurst St Location":** This location is a single-family house, with brick on the exterior, and a concrete landing at the front door. This location is Tyrone DAVIS's residence in the ED/MI.

**C.     Affiant Training and Experience**

I am an agent with the Federal Bureau of Investigation.  I have been an agent with the FBI since 2016.  As part of my duties, I investigate criminal violations of, among other things, controlled substance laws, including violations of 21 U.S.C. §§ 841, 843, and 846, and firearm laws, including violations of 18 U.S.C. §§ 922(g) and 924(c).

I have been directly involved in many narcotics and firearms-related arrests and the service of many narcotics and firearms-related search warrants.  I have participated in handling cooperating sources of information who were involved in narcotics acquisition and/or trafficking.  In addition, I have reviewed thousands of communications between drug traffickers as a result of my participation in multiple wiretap investigations.  I have

had many conversations with drug traffickers and users, as well as with other law enforcement officers, about the methods and language used by traffickers to smuggle, store, and distribute drugs, collect and launder drug proceeds, and avoid getting caught by law enforcement officers.  As a result of my narcotics-related training and experience, I am familiar with the methods and language used to distribute narcotics, to launder proceeds, and to operate drug-trafficking conspiracies.

I know that it is a common practice for drug traffickers to utilize multiple telephones (often, but not always, pre-paid cellular telephones), counter-surveillance, false or fictitious identities, and coded communications to communicate with their customers, suppliers, couriers, and other conspirators for the purpose of insulating themselves from detection by law enforcement.  Moreover, it is not unusual for them to initiate such mobile or prepaid phone service in the name of an associate or family member or in the name of a fictitious individual.  Drug traffickers often require the use of a telephone facility to negotiate times, places, prices, and schemes for importing, possessing, concealing, and distributing controlled substances and for arranging the disposition of proceeds derived from the sale of controlled substances.

I am familiar with the coded language and deceptive linguistic practices typically used by drug traffickers.  I have spent many hours reviewing and transcribing such coded language in preparation for federal indictments and trials. This process of reviewing and transcribing thousands of intercepted communications between drug traffickers, in conjunction with my other experience summarized above, has confirmed beyond any reasonable dispute that it is now a very common practice for drug traffickers to utilize all communication features of their telephones, most notably the voice-call and text-message

features, nearly simultaneously to communicate with their conspirators. For example, it is quite common for a particular transaction to be set up and completed using both voice calls and text messages. In fact, it is now quite unusual for a drug trafficker to utilize solely one feature of a telephone, such as the voice-call feature, to further his/her criminal activities while not also using another feature, such as the text-message feature, to further his/her criminal activities.

This affidavit is being submitted for the specific purpose stated herein. I have not, therefore, included every fact known to me concerning the investigation. In addition, it should be noted that the interpretations of evidence included below are based on the results of the investigation so far, my training and experience, and the training and experience of other law enforcement officers who are involved in this investigation.

**D.      Evidence Commonly Generated by Drug Trafficking**

I am aware that people who are involved in trafficking illegal drugs commonly store items related to their crimes at their residences or stash houses, inside their vehicles, or at the residences or inside vehicles registered to relatives or other trusted associates. I am also aware that the following kinds of evidence have been recovered in a substantial number of residential/stash house and vehicle searches conducted in connection with drug trafficking investigations:

1)      controlled substances;

2)      paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, plastic bags, stamp bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

3)      books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

4)      personal books, papers, cell phones, and other electronic devices;

5)      cash, currency, and records relating to the generation of income and the expenditure of such income (including income from the sale of controlled substances), including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, check registers, and tax return information, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds;

6)      documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

7)      computers, cellular telephones, electronic tablet devices, and other electronic media; including any incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists), and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

8)      firearms and other dangerous weapons;

9)      identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices; and

10)     evidence that rebuts common defenses, such as evidence that demonstrates drugs were not possessed for personal use and the absence of legitimate income to cover expenses.

Based upon my training and experience, as well as the collective knowledge and experience of other officers involved in this investigation, I am aware that it is generally a common practice for drug traffickers to store their drug inventory, drug paraphernalia, drug proceeds, drug records, cell phones, and weapons at or in their residences and stash houses (including garages, outbuildings, and nearby vehicles) or at or in the residences and vehicles of relatives or other trusted associates.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, and/or will be "fronted" controlled substances from their suppliers, record keeping is necessary to keep track of amounts paid and owed, and such records will be maintained close at hand so as to readily ascertain current balances and to keep track of how proceeds are being expended. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past and for payments expected as to the traffickers' suppliers and the traffickers' dealers.

It is also a generally common practice for traffickers to conceal inside their residences or stash houses or businesses or vehicles, or inside the residences or businesses

9

or vehicles of relatives or trusted associates, large sums of money, either the proceeds from drug sales or moneys to be used to purchase controlled substances. Drug traffickers sometimes make use of wire transfers and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in the residences, stash houses, businesses, or vehicles of those involved in selling drugs or their relatives or trusted associates.

Drug traffickers often possess firearms, ammunition, and other dangerous weapons to protect their proceeds and product from others who might attempt to rob them, and to enforce payment from their customers. Drug traffickers do not typically call the police when they are robbed of their drugs or drug proceeds and they do not typically file lawsuits to recover unpaid drug debts. As a result, it is common for drug traffickers to arm themselves instead of calling the police or seeking legal recourse. And because their drug trafficking activities are conducted over an extended period of time, drug traffickers possess firearms, ammunition, and other dangerous weapons for extended periods of time in convenient and safe locations such as their residences, stash houses, businesses, and vehicles and similar locations/vehicles controlled by, and/or registered in the name of, trusted associates or relatives.

When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits or otherwise conceal them from discovery by law enforcement. In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the

implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found either inside the residence, business, or vehicle of the drug trafficker or inside the residence, business, or vehicle of the person in whose name the asset is listed.

Drug traffickers often operate under assumed names to conceal their true identities from law enforcement officers.  In so doing, they may acquire property, services, and personal identification items under their assumed or alias names.  They maintain such items, as well as records relating to such items, in their residences, businesses, and vehicles, together with evidence of their true identities.

The cell phone, in addition to weapons, is a primary tool of the drug trade.  Drug traffickers must maintain telephone listings of the numbers for customers and suppliers to efficiently conduct their drug trafficking business.  Often sent or received text messages and call logs reflecting sent or received calls to/from customers and/or suppliers are stored on cell phones.  The data on current or past cell phones can be particularly strong evidence of drug trafficking and, at the very least, can link a particular drug trafficker to prior communications setting up and/or completing prior drug transactions.

Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and must keep these telephones in their actual (on their persons) or constructive (in their vehicles, residences, and businesses) possession to have ready access to them.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses, as well as in similar locations/vehicles controlled by, and/or in the name of, trusted associates and relatives. Drug traffickers often do not discard their cellular telephones immediately after they stop

actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones.  As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

I am also aware that drug traffickers sometimes take trophy photographs of their drugs, drug proceeds, and firearms and retain the photographs in their residences or on their computers, cell phones, cameras, or other electronic storage devices.  I am also aware that drug traffickers, like law-abiding citizens, sometimes take photographs of themselves with their friends, relatives, and associates and keep the photographs in their residences or on their cell phones.  When they are taken or retained by drug traffickers, such photographs can be evidence, or can lead to evidence, of drug trafficking by identifying closely associated people who are actively assisting and/or supporting the drug trafficking activity.

As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device.  Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally.

Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone.  In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files.  A forensic examiner often can recover evidence that shows when

and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet.  Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools.  When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.

Based on my training and experience, I am aware that each of the following parts of a cell phone is likely to contain evidence of the crimes referenced herein.  Such evidence can extend beyond evidence that directly establishes what crime was committed and by whom to evidence that establishes who used the cell phone and/or when and/or from where. Such cell-phone attribution evidence is particularly important because it links the user of the subject cell phone to the substantive evidence on the subject cell phone; it can link other users of other cell phones to the substantive evidence on the subject cell phone; and it can link the user of the subject cell phone to the location where the subject cell phone was found or where the subject cell phone was previously located based on location information stored on the cell phone.  Moreover, parts of a cell phone that demonstrate the use of the cell phone to perform functions beyond communicating and recording photos/videos, such

as to search the Internet or find addresses/directions, can be important to an investigation of the crimes referenced herein because cell phones are frequently used to prepare for crimes (e.g., to shop for tools of the particular criminal trade) and to complete individual criminal acts (e.g., travel to/from the location of the particular crime):

(1)    incoming and outgoing call and text message logs

(2)    contact lists

(3)    photo and video galleries

(4)    sent and received text messages

(5)    online searches and sites viewed via the internet

(6)    online or electronic communications sent and received, including email, chat, and instant messages

(7)    sent and received audio files

(8)    navigation, mapping, and GPS files

(9)    telephone settings, including speed dial numbers and the telephone number for the subject telephone and related identifying information such as the ESN for the telephone

(10)    call forwarding information

(11)    messages drafted but not sent

(12)    voice messages.

## II.    Probable Cause

### A.    Recidivism

As noted above, the investigation has revealed that the DTO is responsible for the distribution of kilogram quantities of fentanyl/heroin and cocaine/crack, as well as other

controlled substances such as oxycodone, in Western Pennsylvania and beyond.  Several of the members of the DTO continue to engage in large-scale narcotics trafficking despite significant prior convictions and prison sentences.  A summary of the criminal records of some of the members of the DTO follows.

* Devail ADAMS: ADAMS has an extensive criminal record that extends beyond the past 30 years. For example, in 1989, ADAMS was convicted in Michigan for receiving stolen property and drug trafficking. In that same year, ADAMS was convicted in Michigan for committing firearms offenses and assault with intent to do bodily harm. In 1990, ADAMS was convicted in Michigan for escape from jail through violence. In 2002, he was convicted in Michigan for drug possession. In 2005, he was convicted in Michigan for assaulting/resisting/obstructing a police officer. In 2009, ADAMS was convicted in Michigan for drug trafficking. In 2012, he was once again convicted in Michigan for drug trafficking.  In 2022, he was once again convicted in Michigan for drug trafficking.  Also in 2022, ADAMS was convicted in Ohio for drug trafficking.

* Christian FRIERSON: FRIERSON, who is the son of Devail ADAMS, has multiple criminal convictions during the last 15 years. In 2010, FRIERSON was convicted in Michigan for drug trafficking.  In 2012, he was once again convicted in Michigan for drug trafficking.  At that time he was also convicted in Michigan of bringing contraband into prison.

* George WYATT: WYATT has several criminal convictions during the last 30+ years. For example, in 1992, he was convicted in Michigan for sexual assault, assault with a weapon, and weapon possession crimes. In 2003, WYATT was

convicted in Michigan for domestic violence. In 2015, he was convicted in Pennsylvania for drug trafficking. In 2019, he was convicted in Michigan for weapons crimes.

* Christopher BARTON has been convicted in Michigan for committing felony crimes. He was convicted in Michigan in 2018 for carrying a dangerous weapon with unlawful intent. He was convicted in Michigan in 2022 for carrying a concealed weapon. He was also convicted in another case in Michigan in 2022 for carrying a dangerous weapon with unlawful intent.

* Kendra SAGER was convicted in Pennsylvania in 2020 for possession of drug paraphernalia. She was also convicted in 2021 for possession of drug paraphernalia. She was convicted in 2022 for unauthorized use of an automobile.

* Dedric HIGGINBOTHAM has a remarkable number of arrests/charges for serious crimes in Michigan over the last 30+ years that did not result in convictions. In 2023, he was convicted in Michigan of operating a vehicle while impaired.

* Frank CHRISTIAN was on federal supervised release in 2023 and 2024 following a 2018 conviction in federal court in the WD/PA for heroin distribution for which he was sentenced to 48 months in prison. He was also convicted in federal court in 2003 for cocaine distribution and sentenced to 262 months in prison (subsequently reduced to 180 months). In addition, CHRISTIAN has several state-court convictions during the last 30+ years, including for assault, weapons possession, and fleeing/eluding.

* Tyrone DAVIS: In 2007, DAVIS was twice convicted in Michigan of committing drug trafficking crimes.  He also has a 2013 Michigan weapon possession conviction.

**B.     Confidential Source Information**

**1.     Confidential Source 1 ("CS1")**

Confidential Source 1 ("CS1") has been cooperating with law enforcement officers involved in this investigation since January 2023. CS1 is motivated by the hope that CS1's assistance with the enforcement of criminal laws will result in a more favorable resolution of CS1's pending criminal cases. CS1 has a criminal record that includes convictions for drug trafficking crimes during the last 15 years.

CS1 is personally familiar with Christian FRIERSON and has known him for approximately 20 years. CS1 has provided historical and current information on FRIERSON.  Case agents believe CS1 to be reliable and credible.  CS1 is not an anonymous source.  Agents' interactions with CS1 have been in-person, as well as by telephone, and CS1 was fully aware that the agents knew CS1's identity.  The requirement that CS1 provide only truthful information was stressed to CS1 at the beginning of CS1's cooperation.

The following information, as well as other information, was provided by CS1 to agents starting in January 2023.  CS1 knows FRIERSON is trafficking large quantities of narcotics to include cocaine and fentanyl. CS1 knows FRIERSON to utilize the alias "Juicy," which I independently know to be FRIERSON's alias based on information from multiple other reliable informants and investigations.  CS1 knows FRIERSON to have previously resided in a room (room number often changed) at the Quality Inn, located at

1740 New Butler Road, New Castle, PA 16101, when FRIERSON was in New Castle, Lawrence County, PA.

During the last week of October 2023, CS1 provided investigators with fresh information about the whereabouts and actions of FRIERSON and a female associate.  CS1 advised that FRIERSON and the female associate are traveling in a Kia Carnival once, sometimes twice, a week, to the Detroit, MI, area so that FRIERSON can re-supply with cocaine and fentanyl. CS1 advised that FRIERSON is re-supplying with one or two kilograms of cocaine each trip, and with at least one or two kilograms of fentanyl monthly.

CS1 advised that, after re-supplying with cocaine and fentanyl, FRIERSON utilizes the Kia Carnival to transport the controlled substances to the New Castle, PA, area, and historically drives directly to the Quality Inn where the controlled substances are kept prior to being distributed to other drug traffickers.  CS1 advised that when FRIERSON is ready to distribute cocaine and fentanyl to other drug traffickers within the New Castle area, he will utilize the Kia Carnival to transport the controlled substances to complete the sales. CS1 advised that, since the time FRIERSON purchased the Kia Carnival, it is the vehicle FRIERSON utilizes to engage in drug trafficking.  The lien date for the Kia Carnival is May 3, 2023, according to the National Law Enforcement Telecommunications System.

On September 28, 2023, case agents were conducting surveillance at the Quality Inn as part of a separate investigation that was not related to FRIERSON.  During the surveillance at the Quality Inn, case agents observed the Kia Carnival arrive at the Quality Inn, and also observed FRIERSON and an unknown female exit the Kia Carnival and enter the hotel. It should be noted that, during my time as a narcotics investigator, I have been

involved in numerous investigations that involved targets utilizing hotel/motel rooms to store, sell, and distribute controlled substances.

On November 9, 2023, at approximately 7:30 a.m., case agents again observed the Kia Carnival parked in the parking lot of the Quality Inn. The fact that the Kia Carnival was observed at the Quality Inn early in the morning indicates that FRIERSON was renting a room at the hotel.  This further corroborates the information provided by CS1.

CS1 is personally familiar with Devail ADAMS and has known him for approximately 20 years. CS1 has provided historical and current information on ADAMS. CS1 knows ADAMS is trafficking large quantities of narcotics, to include cocaine and fentanyl, on behalf of Christian FRIERSON. FRIERSON is ADAMS's son.  CS1 knows that ADAMS travels back and forth between Detroit, MI, and New Castle, PA.  Case agents learned from CS1 that ADAMS is using a particular cell phone, referred to herein as TT1, which was corroborated as detailed herein.

### 2.      Confidential Source 2

Confidential Source 2 ("CS2") has been cooperating with law enforcement officers involved in this investigation since February 2024. CS2 is motivated by the hope that CS2's assistance with the enforcement of criminal laws will result in a more favorable resolution of charges that may be/have been filed against CS2. CS2 has a criminal record that includes convictions for drug possession crimes in recent years.

CS2 is personally familiar with Devail ADAMS and has known him for approximately two years. CS2 has provided historical and current information on ADAMS. Case agents believe CS2 to be reliable and credible.  CS2 is not an anonymous source. Agents' interactions with CS2 have been in-person, as well as by telephone, and CS2 was

fully aware that the agents knew CS2's identity.  The requirement that CS2 provide only truthful information was stressed to CS2 at the beginning of CS2's cooperation.

The following information, as well as other information, was provided by CS2 to agents starting in February 2024.  CS2 knows ADAMS is trafficking substantial quantities of narcotics to include cocaine and fentanyl. CS2 knows ADAMS to utilize the alias "Pops," which case agents independently know to be ADAMS's alias based on information from multiple other reliable informants.  CS2 knows ADAMS is originally from the Detroit, MI, area, and travels back and forth between Detroit, MI, and New Castle, PA.

CS2 knows that ADAMS and an individual nicknamed "Unc" have a partnership and are cocaine and fentanyl suppliers within the New Castle, Lawrence County, PA, area. "Unc" is known to investigators as George WYATT based on previous investigations and information from multiple other reliable informants. CS2 has purchased controlled substances from both ADAMS and WYATT. CS2 knows that ADAMS and WYATT are supplying a female named Kendra SAGER with crack cocaine and fentanyl. CS2 was aware that SAGER was utilizing an outbuilding on the property of 1222 Randolph Street, New Castle, PA 16101, **(Randolph St Location)**, known as the "Bungalow," to distribute the crack cocaine and fentanyl.

CS2 knows that ADAMS and WYATT were supplying cocaine and fentanyl to individuals who were distributing those controlled substances from 214 East Lutton Street, New Castle, PA. On February 7, 2024, the Lawrence County HIDTA Task Force, along with the Pennsylvania State Police and other law enforcement entities, served a search warrant at 214 East Lutton Street.  Cocaine, fentanyl, and firearms were seized at that location at that time. In addition, evidence was obtained, including messages on a seized

cell phone, showing that ADAMS and WYATT were supplying the occupants of 214 East Lutton Street with controlled substances, including cocaine and fentanyl.

### 3.   Confidential Source 3

Confidential Source 3 ("CS3") was interviewed by law enforcement officers involved in this investigation in February 2024. CS3 was motivated at that time by the hope that CS3's participation in the interview would result in a more favorable outcome of an investigation that involved CS3 and others.  CS3 has a criminal record that includes convictions for theft and drug-related crimes during the last 15 years.  CS3's cooperation in February 2024 was in the nature of an interview.  CS3 was not asked by case agents at that time to provide ongoing assistance.

CS3 is personally familiar with Devail ADAMS and George WYATT. Case agents believe the information provided by CS3 to be reliable and credible. CS3 was not an anonymous source.  Agents' interactions with CS3 were in-person and CS3 was fully aware that the agents knew CS3's identity.  Information provided by CS3 was corroborated by other information and evidence that agents acquired completely independently of CS3.

The following information, as well as other information, was provided by CS3 to agents in February 2024.  CS3 knows ADAMS is trafficking quantities of narcotics to include cocaine and fentanyl. CS3 knows ADAMS to utilize the alias "Pops," which case agents independently know to be ADAMS's alias based on, among other things, information from multiple other reliable informants.

CS3 is personally familiar with an individual nicknamed "Unc," who investigators know to be George WYATT based on previous investigations and information from

multiple other informants. CS3 knows WYATT is trafficking quantities of narcotics to include cocaine and fentanyl.

CS3 knows that WYATT was supplying cocaine and fentanyl to individuals who were distributing those controlled substances from 214 East Lutton Street, New Castle, PA. As previously noted, on February 7, 2024, the Lawrence County HIDTA Task Force, along with the Pennsylvania State Police and other law enforcement entities, served a search warrant at 214 East Lutton Street. Cocaine, fentanyl, and firearms were seized at that location at that time. In addition, evidence was obtained, including messages on a seized cell phone, showing that ADAMS and WYATT were supplying the occupants of 214 East Lutton Street with controlled substances, including cocaine and fentanyl.

### 4.    Confidential Source 4

Confidential Source 4 ("CS4") has been cooperating with law enforcement officers involved in this investigation since August of 2023. CS4 is motivated by the hope for leniency concerning pending criminal charges and by the potential to receive monetary compensation. CS4 was previously convicted of firearm possession, assault, drug possession, and other crimes.

CS4 is familiar with Christian FRIERSON and other members of the Organization. CS4 has provided historical and current information on FRIERSON and other members of the Organization. CS4 has direct access to cellular telephone numbers used by members of the Organization, as these members have provided CS4 with those numbers. Case agents believe CS4 to be reliable and credible because, as demonstrated herein, much of CS4's information has been independently corroborated by prior and/or subsequent events and observations that were beyond CS4's control. CS4 is not an anonymous source. Agents'

interactions with CS4 have been in-person and CS4 was fully aware that the agents knew CS4's identity. The requirement that CS4 provide only truthful information was stressed to CS4 at the beginning of CS4's cooperation.

CS4 knows FRIERSON, and many of the DTO's members, to be from Detroit. Additionally, CS4 is aware of FRIERSON utilizing the alias "Juicy." Case agents have confirmed through multiple investigative means that "Juicy" is a nickname used by FRIERSON and know that FRIERSON, ADAMS, and others are originally from Detroit, MI.

In March 2024, CS4 provided information that FRIERSON was moving kilogram-level quantities of cocaine and heroin/fentanyl in Lawrence County, PA. CS4 added that FRIERSON was in possession of bulk quantities of U.S. currency as well.

In April 2024, CS4 provided information that "Juicy" has multiple locations in New Castle, PA, that he and members of his DTO are distributing narcotics from. CS4 also added that "Unc," known by investigators to be WYATT, is distributing a significant quantity of narcotics on behalf of "Juicy" (FRIERSON).

### 5.     Confidential Source 5

Confidential Source 5 ("CS5") was cooperating with law enforcement officers involved in this investigation from January to February 2024. CS5 was motivated by the hope for leniency concerning pending criminal charges. CS5 was previously convicted of DUI, drug possession, and drug trafficking. CS5's active cooperation with law enforcement officers ended because CS5's personal circumstances made it impractical for law enforcement officers to meet and/or communicate with CS5 without compromising CS5

and/or ongoing investigations. Within the context of the information detailed and relied upon herein, agents believe CS5 is credible and CS5's information is reliable.

CS5 knew that an individual known only to him/her as "Streets" was selling narcotics from 214 East Lutton Street, New Castle, PA. Additionally, CS5 knew that "Streets" was being supplied narcotics by "Pops." Case agents know "Streets" to be an alias for Quinten JONES and "Pops" to be an alias for Devail ADAMS. CS5 was able to provide physical descriptions of both individuals that matched JONES and ADAMS.

CS5 confirmed the hierarchy of the narcotics distribution house located at 214 East Lutton Street, relaying that ADAMS supplied narcotics to the location with an individual known as "Unc." Case agents know "Unc" to be an alias for George WYATT.

**C.    Certain Crimes Committed in 2023 and 2024**

**1.    TBI/FBI-Memphis Controlled Purchase from George WYATT on May 16, 2023**

On May 16, 2023, members of FBI-Memphis and the Tennessee Bureau of Investigation met with an undercover TBI agent at a predetermined location. The undercover agent made a recorded communication to set up a deal for an ounce of heroin. Following the call, the undercover agent was given $2,200 in official FBI funds. The undercover agent then departed the meeting location in an undercover vehicle. The undercover agent traveled to the Citgo Gas Station located at 2418 North Central Street, Knoxville, Tennessee, and pulled into the parking lot. The undercover agent made another call and advised where the undercover agent was parked. The undercover agent was advised to come to the rear of the residence of 121 Springdale Avenue, Knoxville, Tennessee.

The undercover agent drove into the backyard of the residence and was met by an older black male subject. The older black male subject told the undercover agent to come inside the house. Once inside, the undercover agent handed the older black male the agreed-upon amount of money and, in return, received an ounce of heroin. The undercover agent walked back to the undercover vehicle and left the residence. Following the transaction, investigators met with the undercover agent and took custody of the suspected heroin and audio/video recording/transmitting devices. Following the buy, investigators were able to confirm the older black male's identity as George WYATT by showing a state photo of WYATT to the undercover agent. Charges were not filed at that time as the investigation was ongoing.

**2.      New Castle Police Department Traffic Stop of George WYATT on December 7, 2023**

Just after 4:00 AM EST on December 7, 2023, Officers with the New Castle Police Department in the WD/PA conducted a traffic stop on a Hyundai Genesis sedan **(Hyundai Genesis)**, bearing (PA) registration MJT-1183, based on multiple vehicle code violations. Officers approached the driver of the vehicle, later identified as George WYATT, who provided a Tennessee driver's license with a different name. WYATT stated that he just moved back up here (New Castle) from Tennessee within the past several months. WYATT further stated he was coming from his home in West Pittsburg, PA, and heading to a gym in Union Township, PA. Officers noted that the path in which the driver was taking through the city took approximately 40% longer than a more direct route. Officers also observed a backpack, garbage bag, and suitcase in the backseat.

Officers ran the Tennessee driver's license provided and no matches were found. Additionally, the only individual found in Tennessee matching the name on the license was determined to be deceased. The Officer made contact with WYATT who claimed that the information on the Tennessee license was correct. The Officer ran the information again with the same results. Based on the apparently false identification to law enforcement, along with the refusal to provide Officers with his real information, Officers informed WYATT he was under arrest. WYATT was taken into custody and a search incident to arrest yielded a wallet and two cell phones, among other items. Inside the wallet was a large sum of cash (later counted to be $980) and a Michigan identification with WYATT's information.

The **Hyundai Genesis** vehicle was towed and transported to a secure NCPD garage. A scan of the vehicle by a certified canine/handler was conducted.  The certified canine positively "hit" at the driver's-side door. A search warrant for the vehicle was applied for and granted. On December 8, 2023, the search warrant was served and a Ruger LCP .380 pistol, loaded with five rounds, was located under the driver's seat. Charges were not filed at that time to facilitate additional investigation.  WYATT did not engage in an interview with law enforcement, and did not cooperate with law enforcement, following this arrest.

### 3.    NCPD Investigation involving WYATT on December 20, 2023

On December 20, 2023, at approximately 8:54 PM EST, New Castle Police Department Officers contacted an individual (Witness 1) in reference to threats. Witness 1 informed Officers that his/her neighbor pointed a gun at him/her. This started after Witness 1's friend (Witness 2) dropped him/her off at his/her house located at 1150 11th Street in West Pittsburg which borders New Castle in the WD/PA and is serviced by the NCPD.

After Witness 2 left, a white and black Audi sedan followed Witness 2 and was driving recklessly until Witness 2 eventually pulled over. Two black males exited the Audi and approached Witness 2 and began to question him/her on why he/she was in front of their house. Witness 2 then called Witness 1 and informed him/her on what had just happened, and Witness 1 went to confront his/her neighbor. When Witness 1 did that, WYATT and an unidentified black male became confrontational with Witness 1. Witness 1 then realized that the unidentified male was holding a handgun and went back to his/her residence to call 911.

NCPD Officers then started toward WYATT's residence at 1152 11th Street (**11th St Location**) to follow up on the incident. Just before turning on 11th Street, Officers observed the white and black Audi sedan coming off of 11th Street. The patrol vehicle began to trail the Audi to initiate a traffic stop. The Audi began travelling at a higher rate of speed and failed to stop at stop signs. Officers activated overhead lights and sirens but were unable to stop the vehicle after it fled. The vehicle was later located unoccupied off the side of the road. Efforts to track any prior occupants were unsuccessful. From a vantage point outside of the vehicle, a clear tied-off plastic baggie with suspected cocaine could be seen in the center console area. The vehicle was towed from the scene and stored at the NCPD pending a search warrant application.

The next day, on December 21, 2023, a search warrant was applied for and granted. The search warrant was served on the same day and resulted in the seizure of 28.3 gross grams of suspected crack cocaine that was found in the center console. There was also a dark blue iPhone with a red case found on the driver's floorboard and a black Motorola

with a black case found on the passenger floorboard. Attempts to access both cell phones were unsuccessful.

    **4.**      **Controlled Purchases and Search Warrant at 214 East Lutton Street, New Castle, PA**

In early January 2024, members of the Lawrence County High Intensity Drug Trafficking Area (HIDTA) Task Force and the Pennsylvania State Police (PSP) began to receive information about a narcotics distribution house located at 214 East Lutton Street in New Castle. Both agencies began independently conducting investigations of that location. On January 16, 2024, PSP conducted surveillance at 214 East Lutton Street and observed an individual, previously referred to as CS5, entering and exiting the residence within a short period of time, indicative of a drug transaction. PSP then encountered the individual who agreed to cooperate and provided the information included above.

On February 5, 2024, members of the Lawrence County HIDTA Task Force met with a person who will be referred to herein as CS6 at a predetermined meeting location to conduct a controlled purchase of heroin/fentanyl from 214 East Lutton Street. CS6 was cooperating at that time with the hope that doing so would result in a more favorable resolution of pending criminal charges. CS6 had very limited information about 214 East Lutton Street beyond the knowledge gained from previously approaching that location, knocking on the door, and buying narcotics from whoever answered the door. Within the context of the information detailed and relied upon herein, agents believe CS6 is credible and CS6's information is reliable.

Officers conducted a search of CS6 and CS6's vehicle and no controlled substances, currency, or contraband were located. Physical surveillance was established in the vicinity

of 214 East Lutton Street. CS6 was provided official funds and subsequently followed directly to 214 East Lutton Street. CS6 parked on a nearby street and was observed exiting his/her vehicle and entering 214 East Lutton Street through a side door. Approximately four minutes later, CS6 exited the residence out of the same door he/she entered, entered his/her vehicle, and departed. Officers followed CS6 to a predetermined meeting location without making any stops.

CS6 then provided Officers with two clear plastic baggies containing about one gram of fentanyl, cocaine, and tramadol, which CS6 advised was purchased inside 214 East Lutton Street. CS6 and CS6's vehicle were searched, and no controlled substances, currency, or contraband were located. CS6 advised Officers that he/she entered 214 East Lutton Street and was sold the suspected narcotics from a black male with dreadlocks. The description provided by CS6 matched the description of Quinten JONES.

Two days later, on February 7, 2024, a search warrant was served at 214 East Lutton Street by members of the Lawrence County HIDTA and PSP. Prior to the search warrant service, physical surveillance was established on the residence. At approximately 1:30 PM EST on that date, the **Hyundai Genesis** arrived in the vicinity of 214 East Lutton Street. As a result of physical surveillance, case agents are aware of George WYATT being the primary operator of the **Hyundai Genesis**. At approximately 1:35 PM EST, the **Hyundai Genesis** was observed parked behind 214 East Lutton Street. Quinten JONES, wearing a red hooded sweatshirt, was then observed walking away from the **Hyundai Genesis** toward the rear of 214 East Lutton Street as the **Hyundai Genesis** departed the area.

At approximately 2:00 PM EST, law enforcement officers initiated the service of the search warrant at 214 East Lutton Street. As the officers were making entry, JONES

was observed jumping out of a bathroom window on the second floor onto the rooftop below. He then jumped onto the ground where he was taken into custody. JONES was still wearing the red sweatshirt.  JONES did not agree to cooperate with law enforcement officers at that time and was not charged at that time.   During the search of 214 East Lutton Street, multiple items of evidentiary value were found, including cocaine, fentanyl, and firearms.

### 5.      Nebraska Traffic Stop of FRIERSON on March 20, 2024

As of March 2024, case agents were periodically receiving, via a judicial warrant, GPS/E911 location data for a cell phone that Christian FRIERSON had been using for at least several months as of that time (this phone is no longer being used by FRIERSON). On March 11, 2024, the phone location data showed that FRIERSON departed the area of New Castle, PA, shortly after 6:28 PM EST.  FRIERSON travelled directly to Detroit, MI, with no obvious stops or deviations in travel, ultimately arriving around 10:38 PM. On March 12, at approximately 7:58 PM EST, phone location data confirmed that the phone was in the vicinity of the Detroit Metropolitan Wayne County Airport (DTW). Within a couple hours of its arrival at the Detroit Airport, the phone location data stopped reporting indicating that the user of the phone, FRIERSON, had boarded a flight and initiated travel. The phone location data next reported at approximately 11:18 PM PST and was now locating in the area of the Los Angeles International Airport (LAX).

The phone location data confirmed that FRIERSON remained in the greater Los Angeles area for roughly six days. This type of travel was not abnormal for FRIERSON as the investigation revealed that FRIERSON has travelled from DTW to LAX on multiple

occasions. For instance, phone location data and/or subpoenaed flight information confirmed that FRIERSON travelled to and from Los Angeles on the following dates:

| Departure Flight | Return Flight | # of Days |
|---|---|---|
| Jan 8, 2024 (DTW to LAX) | Jan 10, 2024 (LAX to DTW) | 2 |
| Jan 23, 2024 (DTW to LAX) | Jan 26, 2024 (LAX to DTW) | 3 |
| Mar 13, 2024 (DTW to LAX) | N/A | 6 |

FRIERSON remained in Los Angeles and during the evening of March 16 relocated to an area immediately adjacent to LAX and in the vicinity of a number of hotels. FRIERSON continued to locate in that area until the early afternoon of March 19 when FRIERSON initiated travel away from Los Angeles. Based on the reporting frequency of the GPS/E911 location data, it was clear to case agents that FRIERSON was not returning via flight and was likely operating a vehicle as he began to travel east across the United States.

On March 20, at approximately 10:18 PM CST, a deputy with the Douglas County Sheriff's Office (DCSO) (i.e., Omaha, Nebraska) was patrolling Interstate 80 when he observed a silver Honda Pilot travelling eastbound in excess of the posted speed limit. The deputy conducted a traffic stop on the vehicle and noted that it was bearing California Temporary Registration Tag DB34B04. Deputies contacted the occupants of the vehicle, a male driver and female passenger, and immediately observed the male driver, later identified as FRIERSON, smoking a freshly lit cigarette and sweating profusely.

FRIERSON produced a Michigan driver's license and continued to appear very nervous while searching for the rest of his information. FRIERSON reported that he had rented the vehicle utilizing an app called Turo. When asked where he was coming from,

FRIERSON reported that they had visited a friend in Nebraska. The deputy attempted to clarify and asked where the friend lived in Nebraska and FRIERSON appeared to be attempting to think of a response before ultimately ignoring the question. FRIERSON later admitted to having picked up the vehicle in California. The deputy continued questioning FRIERSON and the female passenger, receiving vague and conflicting information. It should be noted that the investigation so far has not produced evidence leading to a conclusion that the female passenger is a member of FRIERSON's drug trafficking organization. She is not listed as a Target Subject herein.

The deputy ultimately attempted to gain consent to search the vehicle, which FRIERSON denied. Due to the numerous indicators of criminal activity, a Certified Narcotics Detection Canine was utilized to conduct a "sniff" of the vehicle. The canine alerted on the vehicle.

A search of the vehicle was initiated. A suitcase, containing male clothing and a cardboard Home Depot-brand box, was located in the cargo area. All of the seams of the box were taped over. The box contained a safe. The key for the safe was with the safe. The key was used to open the safe. The safe contained vacuum-sealed bags containing in excess of 1,000 grams of fentanyl and nearly 250 grams of heroin.

Also located in the vehicle were two cellphones in the center console, a grey iPhone on FRIERSON's person, a phone in a pink case belonging to the female passenger, THC edibles, bulk marijuana, and packaging materials which included a vacuum sealer, vacuum bags, gloves, packing tape, and scissors. After the items were located in the vehicle, the female passenger denied knowledge of the white powdery substance in the vehicle. FRIERSON, after inquiring about the status of the female passenger, accepted

responsibility for everything in the vehicle, but denied knowledge of what the white powdery substance was. He claimed that he found the box but did not provide a location where he found it.

Both FRIERSON and the female passenger were arrested at the conclusion of the traffic stop on March 20, 2024, and charged with drug crimes in Nebraska state court. After that date, investigators stopped receiving GPS/E911 location data for FRIERSON's prior cell phone and a pen register that was active on that cell phone began to show only incoming phone calls and text messages leading investigators to believe that the prior cell phone was seized by the Douglas County Sheriff's Office during the traffic stop.

Neither FRIERSON, nor his female passenger, cooperated with law enforcement officers after the traffic stop. FRIERSON was released on bond within a week. He promptly started drug trafficking again.

### D. CS1 Consensually Recorded Call

On April 4, 2024, at the direction of case agents, CS1 placed a consensually recorded phone call to FRIERSON. FRIERSON used a cell phone, that will be referred to as TT2, to receive this call from CS1. Case agents know that the call was made to TT2 because one of the case agents actually input the phone number for TT2 to initiate the call. At the beginning of the call, FRIERSON states, "my birthday's in three days." Case agents know that FRIERSON's date of birth is April 6, 1991. Case agents recognized FRIERSON's voice on the call. Case agents are familiar with FRIERSON's voice as a result of reviewing many other recorded calls that included FRIERSON as a participant, including jail calls.

During the call, CS1 asked about FRIERSON's Detroit source of supply "Big Cuz/Cuz."  Big Cuz/Cuz was previously thought to be Kristopher JONES but was subsequently identified as Dedric HIGGINBOTHAM, through, among other things, physical surveillance of HIGGINBOTHAM and July 2024 flight records.  CS1 asked, "you ain't never holler at Cuz ass?", and FRIERSON responded, "oh yeah, yep." FRIERSON continued by stating that HIGGINBOTHAM is "waiting for me to come down there", and that he "told the nigga I'm going to be down there this weekend." FRIERSON then commented on the narcotics supply chain, stating "he say, ugh, there has been a lot of that shit around." I believe FRIERSON's statements regarding HIGGINBOTHAM conveyed his plans to travel to meet with HIGGINBOTHAM for the purpose of being re-supplied by HIGGINBOTHAM because HIGGINBOTHAM has a surplus of narcotics.

As the call continues FRIERSON begins to allude to the fluctuating narcotics prices offered by HIGGINBOTHAM, "especially with Cuz ass." FRIERSON stated, "seems like his shit be fluctuating all the time anyway." FRIERSON then more accurately reflected HIGGINBOTHAM's price for narcotics, "first it was 17.5, then it was 17, then it was 16.5, then it was 16." I believe FRIERSON is discussing the current price of a kilogram of cocaine, which in this case is ranging from $17,500 to $16,000.

FRIERSON then discussed another person trying to sell him a quantity of narcotics for $40,000, "what's his name been trying to give me some shit for forty." CS1 asked if the person was an associate of George WYATT, "you talking about 'B,' Unc's people?" FRIERSON responded affirmatively, "Yeah", and added, "he gave Unc one, but I'm going to see what it do with the shit Unc got and if it lands like that, then I'm just going to tell the nigga to give it to him (WYATT) because he trying to front it anyway." During this

phase of the conversation, FRIERSON is alluding to WYATT recently receiving narcotics from the other person. Furthermore, FRIERSON is relaying that he is going to see how well the customer base likes those narcotics before making a decision moving forward.

### E.   Wiretapped Communications

On May 8, 2024, June 7, 2024, and July 3, 2024, orders were issued in the WD/PA authorizing the interception of communications over cell phones used by Devail ADAMS (TT1 and TT4), Christian FRIERSON (TT2 and TT3), Dedric HIGGINBOTHAM (TT5), and George WYATT (TT6).  Communications were thereafter intercepted on a daily basis up to the present time.   It should be noted that the interceptions of communications/evidence discussed herein are based on the results of the investigation so far, my training and experience, and the training and experience of other law enforcement officers who are involved in the investigation.

### 1.   Re-supply and Re-distribution

On the first day of interceptions (i.e., May 9, 2024), calls were intercepted over TT1, used by Devail ADAMS, and over TT2, used by Christian FRIERSON, demonstrating that they were low on narcotics and intended to re-supply in the near future. For example, on May 9, 2024, ADAMS received a call on TT1 from Robert WILLIAMS who was using a phone with number 724-651-2191.  Several calls have been intercepted between ADAMS/TT1 and WILLIAMS during which WILLIAMS has referred to himself, or been referred to as, "Bob" (i.e., short for Robert).  During the May 9 call, ADAMS informed WILLIAMS that the DTO was low on the yet-to-be-determined kind of narcotics WILLIAMS was looking for – "Aye, shit, we out right now Bob. Tryin' to find some now." WILLIAMS requested confirmation by replying "You're out?", and received it when

ADAMS answered "Yeah!"  ADAMS then optimistically told WILLIAMS "You know it ain't gonna be for long though!"  The call ended shortly thereafter.

On the same day as the ADAMS-WILLIAMS call, FRIERSON, using TT2, received a call from Dedric HIGGINBOTHAM/TT5.  During the brief May 9 call with HIGGINBOTHAM, FRIERSON referred to the caller as "Cuz" and asked, "What's the word my baby?" – checking on when HIGGINBOTHAM could re-supply him. HIGGINBOTHAM answered, "Shit, hopefully I'll be down there in, a couple days" – indicating that the re-supply could occur in a matter of days.  FRIERSON then confirmed that he was ready to be re-supplied – "Ok, yeah, that's what I was try'n to figure out, shit I'm waitin' on you!"

The next day (i.e., May 10, 2024), HIGGINBOTHAM, using TT5, once again called FRIERSON/TT2 to discuss the status of the re-supply.  During the brief call, FRIERSON once again confirmed that he was ready to be re-supplied and indicated that he did not want to be losing customers and market share – "Man, wait'n on you, I ain't try'n to be leak'n! But I'll slide down if I need to."  HIGGINBOTHAM replied, "Aight, naw, naw man we, we, I'm get'n it. This shit is about to happen" – indicating that the re-supply of to-be-determined narcotics was imminent.

Later that same day, which was a Friday, FRIERSON, using TT2, and HIGGINBOTHAM, using TT5, once again had a phone conversation about the status of the re-supply of to-be-determined narcotics.  During the call, HIGGINBOTHAM informed FRIERSON that the re-supply would occur the following week – "if you can wait 'til next week, it's come, it's goin' down bro."  FRIERSON responded, "Ok" – confirming the plan to re-supply the following week.

During the days after the May 9 and May 10 calls detailed above, both FRIERSON and ADAMS traveled to Detroit and thereafter returned to New Castle in the WD/PA as revealed by location data for TT1 and TT2 obtained via judicial warrants. Subsequent intercepted communications indicated that the re-supply did occur "next week" as HIGGINBOTHAM discussed with FRIERSON on May 10. A call was intercepted on May 17 between Devail ADAMS/TT1 and George WYATT/TT6. As previously explained, WYATT is one of ADAMS's trusted drug trafficking peers. During the May 17 call, ADAMS bluntly told WYATT that he (i.e., ADAMS) was "getting ready to hit these keys" – referring to kilograms of to-be-determined narcotics that ADAMS was going to process for re-distribution. WYATT replied by referencing a yet-to-be-identified customer who wanted to set up a drug deal, telling ADAMS that the customer was "trying to pump at you." ADAMS then indicated that he was aware that the customer wanted a volume discount for to-be-determined narcotics – "he was talking some 3 for 1 stuff."

Calls intercepted over TT2 on May 22 and May 24 further establish the re-supply/re-supplies of the DTO. On Wednesday, May 22, FRIERSON received a call on TT2 from HIGGINBOTHAM/TT5. During the call, HIGGINBOTHAM informed FRIERSON of his plans to travel to the New Castle area in the WD/PA to acquire two houses – "I got an appointment to be down there Friday morning man. I got two houses I'm about to cop down there." After FRIERSON replied, "For real?", HIGGINBOTHAM confirmed, "Hell yeah. I guess that's why I'll be down there early in the morning." FRIERSON then informed HIGGINBOTHAM that the DTO is ready to be re-supplied with narcotics after HIGGINBOTHAM arrives in the New Castle area – "Alright, bet. Shit, we waiting on you." HIGGINBOTHAM responded by re-confirming the plan to travel to

the WD/PA for the purpose of acquiring property and re-supplying the DTO – "Friday baby," and then FRIERSON re-confirmed as well – "Alright, bet. Yup, I'm a try to line some shit up."

A call that was intercepted over TT2 between FRIERSON and George WYATT/TT6 two days later on Friday, May 24, confirmed that the DTO had recently been supplied by HIGGINBOTHAM. During the call, WYATT discussed his desire to sell ounces of FRIERSON's cocaine to make some money – "I need to come down there and flip a couple zips of uhh, a girl." After further discussing WYATT's financial problems, FRIERSON informed WYATT that the DTO was recently re-supplied with the narcotics WYATT was looking for and that the DTO was processing the narcotics with another substance to increase the volume – "We just grabbed that girl an' shit so. . . . I was about to fatten them bitches up on they ass." WYATT responded by asking who supplied the DTO – "Yeah. Oh, you just grabbed that shit like from uhh, from Cuz?" FRIERSON answered in the affirmative – "Yeah." FRIERSON's statement shortly thereafter during the same call revealed that the "Cuz" WYATT was referring to as the supplier was HIGGINBOTHAM. FRIERSON stated, "Cuz supposed to be coming down here today. . . . He said he's about to get two houses. He about to buy two houses."

### 2. Workers and Traphouses

On May 11, FRIERSON, using TT2, and a male, using number 313-419-5936 (referred to as UM5936 and believed to be Quinten JONES), had a conversation about some of the drug dealers FRIERSON and ADAMS have working for them in New Castle. FRIERSON told UM5936 "you done missed your motherfucking spot boy. You know Caesar and Pat ass down here getting that money" – informing UM5936 that he is missing

out on an opportunity to make money by dealing drugs for the DTO like Daniel RASNICK and Patrick BROWN are. Shortly thereafter during the same conversation, UM5936 stated, "Fuck that, I need that" – expressing an interest in dealing drugs for the DTO. FRIERSON responded, "For real. Yo ass was supposed to been came when I needed you bitch. I was losing money, everything, I got, I had fiends over there working" – informing UM5936 that FRIERSON needed more drug dealers because he had to resort to drug users working the DTO's traphouses.

FRIERSON then informed UM5936 that two of the drug dealers FRIERSON was able to get to New Castle to work for him are "Danny" and "Pat" – "I end up getting Danny ass down here, and then Pat ass came right behind him on some shit." FRIERSON noted that Danny (i.e., RASNICK / a/k/a "Caesar" and "nephew") and Pat (i.e., BROWN / a/k/a "B") are now making money selling drugs for the DTO – "They both eating now though." FRIERSON then explained that he and ADAMS, a/k/a "Pops" (i.e., FRIERSON's father), are in the process of establishing another traphouse – "We ain't even bust the new place open yet." UM5936 questioned, "Y'all didn't? The one Pops was at?" FRIERSON answered, "Nope, we didn't even bust it open yet" – referring to the additional traphouse they are about to establish in New Castle.

On May 18, FRIERSON, using TT2, made an outgoing call to a male who was using number 865-393-4532 (referred to as UM4532). During the call, FRIERSON told UM4532 that he (i.e., FRIERSON) is "out here in PA right now" and that he is "getting busy" – meaning that FRIERSON is in the WD/PA and is busy re-distributing the narcotics he was re-supplied. FRIERSON then told UM4532 that he (i.e., FRIERSON) and ADAMS have two traphouses in New Castle – "We got motherfucking um, we got two places down

this motherfucker though for real. Pops just be up at the new one, we got a new one." Referring to the newest traphouse, FRIERSON stated "We starting that bitch off."

As previously noted, FRIERSON/TT2 and HIGGINBOTHAM/TT5 communicated on May 22 about HIGGINBOTHAM's plan to acquire two houses in the New Castle area, likely to serve as additional traphouses for HIGGINBOTHAM and the DTO.  A call intercepted on June 4, between TT2/FRIERSON and TT5/HIGGINBOTHAM, revealed that the plan to acquire two additional houses for the DTO had progressed.  During the call, HIGGINBOTHAM informed FRIERSON, "I need you man", and then elaborated, "I got two places down there right. I need you to cover, I need two grand tho." Here, HIGGINBOTHAM is referring to two properties located in the greater New Castle area that HIGGINBOTHAM is in the process of acquiring but needs FRIERSON to provide $2,000 to an unidentified person to complete the acquisition. This is corroborated by HIGGINBOTHAM's following communication, "I need you to get a money order and drop it right to him, it's in, it's in umm New Castle." FRIERSON responded, "it'll have to be as soon as I hustle up on it", and HIGGINBOTHAM reiterated, "those ma'fuckers just begged me to get up there and green light just a minute ago", highlighting how quickly HIGGINBOTHAM wanted the transaction to occur. Near the end of the conversation, FRIERSON indicated he was willing to make the request a priority, "today might be a good day though", and that he would, "hustle up on it today fa-sho."

### 3.     Infiltration and Exploitation

HIGGINBOTHAM's travel to the New Castle area to finalize the acquisition of two new traphouses was delayed in late May.  Subsequent intercepted communications in early June, however, in conjunction with physical surveillance, revealed that

HIGGINBOTHAM did, in fact, travel to the New Castle area and did meet with FRIERSON after arriving in the New Castle area.  On June 8, FRIERSON/TT2 and HIGGINBOTHAM/TT5 had a conversation after HIGGINBOTHAM arrived in New Castle (as revealed by, among other things, GPS/E911 location data for TT5 obtained via a judicial warrant).

During the conversation, HIGGINBOTHAM asked, "Hey, where that apartment building at, you was talking about?"  FRIERSON then asked, "Which one?"  HIGGINBOTHAM answered, "The one you said had all the fiends."  FRIERSON then answered, "Oh, ugh. That apartment building is ugh, on the ugh, on the South. It's like on the Sheep Hill."  It is apparent from these questions and answers that FRIERSON and HIGGINBOTHAM had previously discussed an apartment building where drug users resided and HIGGINBOTHAM was interested in checking it out while he was in town.

Shortly thereafter during the same conversation, FRIERSON told HIGGINBOTHAM that he (i.e., FRIERSON) was on his way to another location where drug users live and invited HIGGINBOTHAM to meet up with him to review that location – "We about to pull up in the Neshannock projects. . . . Pull up on me ugh, and we can just what's his name, ride through that motherfucker."  HIGGINBOTHAM replied, "Alright, I'll see you in a minute."

When the call ended, FRIERSON/TT2 texted HIGGINBOTHAM/TT5 – "Neshannock avenue apartments" – informing HIGGINBOTHAM of the name of the apartment complex they were going to check out together.  Following the call and text message, physical surveillance resulted in the observation of FRIERSON and HIGGINBOTHAM meeting near a convenience store in New Castle.  They then traveled

in their vehicles away from the convenience store ultimately arriving at the **Highland Ave Location**.  Physical surveillance was thereafter terminated to avoid being spotted by HIGGINBOTHAM and/or FRIERSON.

On June 10, after HIGGINBOTHAM returned to Detroit, he had a conversation over TT5 with Tyrone DAVIS who was using a telephone with number 313-774-7554. The conversation revealed HIGGINBOTHAM's plans to not only set up two new traphouses in New Castle, but also to recruit young people from Detroit to deal drugs from the traphouses for him.

During the conversation, HIGGINBOTHAM asked DAVIS if they had any young people who were willing to re-locate to New Castle to deal drugs for them – "Man, we ain't got no young niggas 'round to go out of town?"  DAVIS answered that a person he would trust to re-locate for that purpose was not available at that time because that person got a job – "the nigga I can trust shit is nigga close shit. That nigga got a job now." HIGGINBOTHAM expressed his frustration at not having young drug dealers to staff his traphouses in New Castle – "Damn, man I got this shit set up now man ready to go." Shortly thereafter during the same conversation, DAVIS volunteered to work one of the traphouses in New Castle – "shit nigga I will go down there then fuck that man." HIGGINBOTHAM declined the offer because DAVIS was too important to HIGGINBOTHAM's drug trafficking operation in Detroit – "Man, naw, I need you here. Stay on top of these dummies man."

Also on June 10, HIGGINBOTHAM had a conversation over TT5 with FRIERSON/TT2.  At the time of the lengthy conversation, FRIERSON was at the hospital where a girlfriend was about to give birth to their child.  Near the beginning of the

conversation, HIGGINBOTHAM referenced some of the complications he was having acquiring and preparing the two new traphouses for the DTO in New Castle – "They made a nigga put a deposit down on lights and I'm like damn, that some hoe shit bro."

FRIERSON then transitioned the conversation to the subject of acquiring traphouses in other towns in the area, such as in Ellwood City in Lawrence County – "Yep, yep, I told you and I just was riding through Ellwood though this like the way going to Pittsburgh. . . . It's nice through there you seen it?"  HIGGINBOTHAM then expressed a concern about appearing to be an outsider – "Man that shit is all white bro" – and FRIERSON addressed that concern – "Yep that's what I said, that's what I said. If a nigga try to do something out there you gotta be, got to have the white nigga with you."

FRIERSON went on to inform HIGGINBOTHAM that he was developing a plan to place Daniel RASNICK (a/k/a "UM8916," "Caesar," "nephew"), one of the DTO's workers, in a traphouse in Ellwood City to deal narcotics for the DTO – "I was thinking like Danny would be perfect out there."  HIGGINBOTHAM replied with approval of that plan – "you got to buy they, buy his house out there. To put him out there. See, I we, I would go halves with you and do that shit bro."

The subject of the conversation then changed to the apartment complexes in the New Castle area that HIGGINBOTHAM checked out for the purpose of identifying drug customers and distribution locations.  HIGGINBOTHAM stated, "them projects man, I went to every project out there."  HIGGINBOTHAM then stated, "you can't get up in them projects unless you got somebody on welfare or somethin', so a nigga got to hook up with" – expressing a desire to find low-income people to exploit to get the DTO into the projects. FRIERSON replied that he had already infiltrated those locations in New Castle – "I got

people in every projects down here." FRIERSON then noted that members of the DTO need to be careful when trafficking narcotics in the projects because of surveillance cameras – "You can't be riding in the projects there's cameras everywhere." HIGGINBOTHAM replied, "Man, and I was about to tell you that, that's why I say man you crazy thinking them motherfuckers ain't on you, and you riding Detroit plates."

The conversation then turned to the subject of how drug dealers are sentenced in Western Pennsylvania if they get caught. FRIERSON stated, in reference to state court, "what they do is throw sweet deals for everybody, anybody that gets caught with anything bro, they going to throw you a sweat deal." FRIERSON elaborated, "it doesn't matter what you get caught with man, I'm talking about they going to give you a couple years man you out."

FRIERSON went on to tell HIGGINBOTHAM that even large-scale drug traffickers get sweet sentences, even in federal court, in Western Pennsylvania – "even the feds don't hang you though dog. My brother's baby momma, he got caught on a conspiracy with some niggas up in Beaver Falls. They end up giving him like two years, two-and-a-half years and another nigga like five years, the the head nigga. The top nigga got five years and it was on conspiracy for like, I think it was like five, five, five, or ten chickens or some shit like that."

FRIERSON went on to tell HIGGINBOTHAM that the way drug dealers are sentenced in Western Pennsylvania "don't even make sense" and that it would be a bad idea for them to engage in drug trafficking in Detroit instead of in Western Pennsylvania – "Don't make no sense to go back home man, I can do what I want." According to

FRIERSON, for drug traffickers in Western Pennsylvania, "Streets paved in gold down this mug man."

FRIERSON then further expressed his desire to expand the DTO to towns beyond New Castle in Western Pennsylvania – "And it's sweet cause we ain't even scratched the surface yet Cuz, we only in one little spot. This so many places around this people. People that be coming to, people from around here be coming to New Castle. From places around here so we can man touch every part of this motherfucker."  HIGGINBOTHAM agreed with the plan to expand the DTO to infiltrate other communities beyond New Castle – "That's right. That's why you need. We got to hook. Man, that's why I'm a be down there with you man. We got to hook up with some white niggas man."

FRIERSON thereafter concluded that particular part of the conversation by expressing his optimism that the DTO will further infiltrate other communities with HIGGINBOTHAM's assistance – "I just needed. That's all I needed. All I needed was you Cuz, a nigga like you bro, it's over with man."  HIGGINBOTHAM expressed his optimism as well – "Man, you watch what's about to happen though."

On June 16, HIGGINBOTHAM/TT5 and FRIERSON/TT2 had another conversation, this time about how to salvage crack cocaine that was not processed properly. HIGGINBOTHAM had the crack cocaine to supply, but was concerned about its quality, and, as a result, consulted FRIERSON.  Referring to the cocaine as "work" that someone messed up, HIGGINBOTHAM asked FRIERSON what FRIERSON added to a prior supply of cocaine to salvage it – "Hey, that shit you said you had to put, what you put on it? You said a sprite?"  FRIERSON answered, "Ahh, ahh, ahh, naw like Casamigos, that

Cristalino." HIGGINBOTHAM asked for confirmation that it was some kind of liquor – "Ca- some liquor?", and FRIERSON confirmed that it was – "Yeah."

HIGGINBOTHAM then further explained that he was asking because someone "burnt some work of mine man, I'm tryin' to see how to fix it man. It turnt, it fucked it up. . . . And he, he was doin' it without puttin' soda on it" – referring to someone who did not cook HIGGINBOTHAM's cocaine into crack properly. FRIERSON once again endorsed Casamigos and stated "Definitely will change the taste for sure, if it's the taste."

One minute after discussing the subject with FRIERSON, HIGGINBOTHAM called Roy BROWN/248-520-6010 and told him "Man put some Casamigos, they said that'll change it." BROWN replied, "Migos, alright." HIGGINBOTHAM immediately followed up with the statement "That'll change the taste if they, if they, if it ain't straight right now. First try that though, but, Casamigos it'll do it" – once again referring to salvaging improperly processed crack cocaine.

HIGGINBOTHAM has called Devail ADAMS on several occasions using an alternative phone with number 313-721-2306. Several communications between HIGGINBOTHAM/x2306 and ADAMS/TT1 have been intercepted so far. HIGGINBOTHAM has been confirmed as the user of the x2306 number by, among other things, the sound of his voice as well as by the content of the calls that has closely corresponded with calls over TT5.

On June 17, HIGGINBOTHAM/x2306, who was not in New Castle, and Devail ADAMS/TT1, who was in New Castle, discussed ADAMS assisting HIGGINBOTHAM by picking up the keys from the real estate company for at least one of the traphouses that HIGGINBOTHAM acquired:

> DH:   Man you think you picked them keys up for me, to the house?
> DA:   Where dey at?
> DH:   I'ma send you the address and stuff.
> DA:   Okay.

Later that same afternoon, HIGGINBOTHAM/x2306 and ADAMS/TT1 discussed additional details regarding the plan for ADAMS to pick up the keys for a traphouse from the real estate company.  HIGGINBOTHAM indicated that the location was being acquired under his girl's name – "That's my girl name" – but when ADAMS asked, "how do you pronounce the last name?", HIGGINBOTHAM did not know – "Man I don't know. Lemme call her and find out."

They then discussed a cover story to address the possibility that someone from the real estate company could ask ADAMS why he is picking up the keys.  ADAMS stated, "Alright, but look though, so what's my story? I'm her brother?" – inquiring if he should pretend to be the brother of HIGGINBOTHAM's girl whose name was being used to acquire the property.  HIGGINBOTHAM answered, "You just, yeah her brother you just comin' in to get the keys, you given 'em the money and gettin' the keys."

The conversation between ADAMS and HIGGINBOTHAM about the keys to the property gained added significance as context for a call between ADAMS/TT1 and George WYATT/TT6 that occurred the next day.  On June 18, ADAMS and WYATT discussed HIGGINBOTHAM, i.e., "Cuz," and how ADAMS paid HIGGINBOTHAM for fentanyl HIGGINBOTHAM previously supplied – "I had to pay Cuz a thousand dollars. I mean, I had to, well I owed him. But, he sent me to grab some keys for a place, so, pick up some keys for a new house."

ADAMS then informed WYATT that ADAMS was not ready to pay back the full drug debt owed to HIGGINBOTHAM because they had other fentanyl ("boy" and "dog"

are common coded terms for fentanyl) to sell before they started selling the fentanyl that HIGGINBOTHAM supplied – "I really wasn't ready to pay him because when, when I even got. When I even got the ahh, the girl from him, I mean the boy from him I told him. I said Cuz, you going to have to wait. . . . 'cause we got a lot of dog, so, you going to have to wait for us to finish."  ADAMS went on to specify that he paid $2,000 of the $2,500 drug debt owed to HIGGINBOTHAM – "I still gave him, I owed him 25, I gave him 2000 of it. I really couldn't afford, I wanted to wait."

WYATT replied by asking whether HIGGINBOTHAM was upset about not receiving the additional $500 -- Man, he got mad about the 500?"  ADAMS indicated that HIGGINBOTHAM was not upset and mentioned that FRIERSON (a/k/a "Juicy") owes HIGGINBOTHAM a drug debt as well – "Naw, hell naw. Naw, Juicy, Juicy, I owe him umm, 500, and Juicy owe him umm, 15."  ADAMS emphasized that he promptly paid his debt to HIGGINBOTHAM for cocaine (a/k/a "girl") that HIGGINBOTHAM supplied – "But I paid his ass quick on the girl. Like, I owed him 3000 on the girl. I paid, I paid that, I paid him that in like a week."  WYATT expressed his understanding, replying "Right."

TT4, in addition to TT1, has been possessed and used by ADAMS recently as an alternative, high-frequency phone to communicate with some of the DTO's workers and customers.  One of the workers/customers that ADAMS/TT4 has communicated with is Kendra SAGER/724-355-8760.  A text message ADAMS/TT4 sent to SAGER on June 12 revealed that, as of that date, ADAMS was not pleased with SAGER because SAGER was not dedicated to forwarding the rest of the drug proceeds (a/k/a "cheese") to ADAMS as soon as possible – "One of the most important things in any relationship..... is loyalty for sure, now I've shone you the type of dude I am now what do you plan to show me? You

ain't brung me one nickel of my cheese....but to top that off you shopping and spending whatever you spend whether it's a dollar or a hundred you spending it somewhere else, you might wanna rethink that frfr and have a conversation with me about what you owe me".

SAGER called ADAMS/TT4 that same day in response to ADAMS's text message. SAGER started the call by telling ADAMS that what he stated in the text message was correct and by noting that she did forward some drug proceeds to the DTO by paying George WYATT (a/k/a "Unc") – "Hey! No, you're completely and totally right. The money that I had brought Unc today was my dues, was a like, for him to end up pulling off on me."

The rest of the conversation between ADAMS and SAGER demonstrates the lengths to which members of the DTO will go to exploit desperate people so that the DTO can, among other things, hide behind them and sell narcotics from their residences. SAGER told ADAMS where she was staying recently – "I've been down Harrison Street at my girl's house."  ADAMS jumped on SAGER's statement regarding where she was staying, repeatedly asking SAGER about who the girl is – "Who is that? . . . . Who is that?"

When SAGER answered, "She's by herself, her kid's in jail. She literally has no money, no income," ADAMS immediately stated, "She need us man!" – sensing the possibility that the DTO could hide behind the woman, take over her house, and turn it into a traphouse.  When SAGER expressed some lack of understanding – "Huh?" – ADAMS responded by telling SAGER that she should have told him about the traphouse opportunity sooner – "See, that's what I'm saying. See, this is how, this is how you show me that you fuck with me. You supposed to bring me shit like this. Why you just now telling me?" SAGER explained that she did not try to immediately exploit the woman because SAGER

needed to condition her for it – "I got to wait until she. She just now getting comfortable with me being there with drugs. Like, she's an addict but she let me take her car."

ADAMS then told SAGER that all she needed to do was link ADAMS up with the woman and ADAMS would take the lead in convincing her to allow the DTO to sell drugs from her house – "Yeah, but all you got to do is just make the introduction man." SAGER thereafter stated that she would forward the woman's address to ADAMS – "I'll send you the address." ADAMS responded with approval – "Man, that's what I'm saying man. That's what I'm saying Kendra." ADAMS then expressed his desire to follow up on the opportunity to hide behind the woman and turn her house into a traphouse – "I'm about to see because that's the shit that's valuable to me, a place for us to motherfucking get some money."

### 4.    Frank CHRISTIAN Supplies the DTO

Communications intercepted over Devail ADAMS/TT1 and George WYATT/TT6 have demonstrated that they are acting as partners in supplying the DTO's customers and in securing an additional source of supply – i.e., Frank CHRISTIAN – for the DTO. For example, on June 10, ADAMS/TT1 called WYATT/TT6 and told WYATT that an unnamed customer wanted to purchase cocaine ("her") and fentanyl ("him") – "He wanted umm, 40 of her and 20 of him." WYATT replied by telling ADAMS that he was out of fentanyl at that particular moment in time and needed more fentanyl from ADAMS – "I ain't got no him that's why I was fitting to call you and tell you to bring me the him." ADAMS responded, "Ok" – agreeing to bring fentanyl to WYATT.

On June 11, WYATT/TT6 called ADAMS/TT1 about securing a new source of supply for the DTO – i.e., Frank CHRISTIAN a/k/a "Baby Frank." CHRISTIAN has been

a well-known drug trafficker in the New Castle/Lawrence County area for years.  As detailed previously, he has an extensive criminal record that includes two prior federal heroin and cocaine trafficking convictions, and prison sentences, during the last 25 years. He has been on federal supervised release in 2023 and 2024 while being supervised out of Atlanta, Georgia.

During the June 11 call, WYATT told ADAMS that WYATT was in the process of securing a supply of fentanyl ("wap") – "Got that wap on the way baby!"  ADAMS replied, "Oh, the wapity wap" – recognizing what WYATT was talking about.  WYATT then told ADAMS who he was going to get the fentanyl from – "Yeah, from ugh. I don't know if you, I don't know if you met 'Baby Frank' before."  WYATT went on to explain that CHRISTIAN was going to start off by supplying them with a smaller quantity of fentanyl so that they could test the quality on their customers – "He's just brining it over here for a tester."  ADAMS responded with agreement, "Ok."

During the same conversation, WYATT conveyed additional background information about CHRISTIAN to ADAMS, explaining that CHRISTIAN has been a major drug trafficker in the area for years and is currently based out of Atlanta – "he been down here for years man. This nigga was runnin' this bitch for a long time. Riding through here in brand new Porches. Brand new Benz's and all that shit. He down in Atlanta now, got his own trucking company."

WYATT went on to highlight that, according to WYATT, CHRISTIAN's criminal history includes not only major drug trafficking but also murders – "That nigga done beat five bodies down this bitch."  ADAMS expressed his admiration – "Oh, yeah. So, he be doing somethin' right huh."  WYATT responded, "Yeah, yeah. Hell yeah. He beat them

motherfuckers. I was in the county jail when he beat one, the motherfucker was telling me before I met him, that he beat several of them bitches."

Near the end of the conversation, WYATT told ADAMS that CHRISTIAN was going to meet with WYATT to provide the fentanyl to WYATT – "Yeah he 'posed to be dropping it off to me."  ADAMS replied, "Ok."  WYATT then informed ADAMS that CHRISTIAN would likely charge $30 per gram of fentanyl – "That nigga want 30 a gram for that shit."

The next day, June 12, ADAMS/TT1 called WYATT/TT6 to work out additional details regarding the fentanyl from CHRISTIAN.  ADAMS referenced "Juicy" (i.e., Christian FRIERSON) being in on the deal.  ADAMS stated that they would collectively get 100 grams of fentanyl to start off – "we all gonna end up with 100 yams."  ADAMS then conveyed his math that, based on $30 per gram as previously discussed, the total price for 100 grams would be $3,000, and ADAMS, WYATT, and FRIERSON would each owe $1,000 – "I got um, that's gonna, that's a 1000 a piece right?"  WYATT agreed with ADAMS's math – "Yep!"

ADAMS and WYATT then congratulated themselves on their teamwork in securing more fentanyl to distribute in the New Castle area.  ADAMS stated, "You got to be on the team, you got to be on the team dog!"  WYATT agreed, "That's right, we gotta be teamworking baby!"  ADAMS replied as if fentanyl trafficking was like playing football – "Yeah, that's means at any point in time, anyone of us can be quarterback!"  WYATT very much agreed with the football comparison – "God damn right."

Two days later, on June 14, ADAMS/TT1 called WYATT/TT6.  WYATT's statements during the conversation confirmed that the DTO had been supplied fentanyl by

CHRISTIAN and CHRISTIAN was pressing WYATT to meet again for the rest of the money owed to CHRISTIAN for the fentanyl. WYATT stated in reference to CHRISTIAN and the fentanyl debt – "Man that nigga man, that nigga on my ass about that 500 man! Man, all this motherfuckin' mornin' man! Ya want me to pull up, want me to pull up." WYATT then provided additional details identifying CHRISTIAN – "Frank about 40, maybe 50" and "you mention his name, everybody know who 'Baby Frank' is."

On June 18, ADAMS/TT1 and WYATT/TT6 once again discussed paying CHRISTIAN for fentanyl supplied by CHRISTIAN. WYATT told ADAMS that he was about to meet with CHRISTIAN – "I'm fitt'n to pay Dog right now, I told him to pull up on me in about 30 minutes." ADAMS expressed his understanding – "Oh, ok" – and then mentioned that FRIERSON a/k/a "Juicy" would owe WYATT for some of the money WYATT provided to CHRISTIAN – "Juicy owe you then." WYATT agreed and indicated that he would work it out with FRIERSON – "Right, right I'll get it 'cause I got his shit, I'm gonna get by."

At least two recent meetings between WYATT and CHRISTIAN in New Castle have been confirmed through recordings from Public Housing Authority surveillance cameras of a parking lot where they met on two occasions. Both meetings occurred while there was daylight. One meeting occurred on June 11, 2024, and the other meeting occurred on June 18, 2024. Case agents for this investigation are familiar with what WYATT and CHRISTIAN look like and with a vehicle CHRISTIAN has been operating. They reviewed the recordings and recognized WYATT, CHRISTIAN, and the vehicle.

Even more recently, on July 24, WYATT/TT6 spoke with an unidentified male, who will be referred to as UM1871, about a downgrade in the quality of crack cocaine

CHRISTIAN recently supplied. At the beginning of the call, WYATT told UM1871 "I want to beat the shit out of Baby Frank dog!" UM1871 asked, "He did you dirty?", and WYATT immediately replied, "he did me dirty dog." UM1871 sympathized, "he always do that. He going to come through the first time and then when he come back it's going to be fucked up."  WYATT agreed, "Yeah, then the nigga tell me, aww man, it just came off the same brick," meaning the cocaine supply was part of the same kilogram of cocaine that WYATT was provided during a previous transaction.

WYATT then provided further details on CHRISTIAN's excuse for the crack cocaine being overcooked, "Talk about ugh, I must have burned it up. I said dog listen, I've been cooking crack since before you was born. You can't burn it up!" UM1871 agreed, "hell naw, you can overcook that motherfucker, but it's still going to be there." WYATT further explained, "As soon as I put that bitch in the microwave, he hadn't even got out the parking lot of Sciota, and I looked at the stuff, man this is some straight soda man!" – referring to baking soda which can be used to process crack cocaine.

### 5.    Worker "B"/Patrick BROWN

Communications intercepted over TT1 and TT4, both used by Devail ADAMS, have confirmed that one of the drug dealers the DTO has working its traphouses is a male referred to as "B," subsequently identified as Patrick BROWN.  For example, on June 16, ADAMS/TT1 spoke with Robert WILLIAMS/724-651-2191.   During the call, WILLIAMS ordered a quantity of narcotics, likely fentanyl – "Hey I'm on my way but put me together a couple?"  After ADAMS agreed to the drug deal – "Yeah I got you" – WILLIAMS asked if he would be receiving the same narcotics from ADAMS that B was

selling for the DTO – "Alright, is that what is that what uh B has that new stuff?" ADAMS responded in the affirmative, "It's, uh, yeah."

Also on June 16, ADAMS/TT1 spoke with Alexis DONNELL/724-730-0066 and received a negative report on the quality of the new stuff, likely a mixture containing fentanyl that the DTO cut with at least one other powdery substance. DONNELL, referring to her customer, stated "my people said that shit is trash straight trash." ADAMS expressed disbelief because other customers who received it from one of the DTO's traphouses, referred to as "the coop" or "the bungalow" (**Randolph St Location**) and often worked by B, provided positive feedback – "I don't understand it though cuz shit they liking all in the coop."

On June 17, ADAMS, using TT4, received two text messages, likely from B using a phone with number 724-202-9513, directing ADAMS a/k/a "Pops" to call one of the DTO's customers named "Amber" at a particular phone number. The first text message stated "Amber +1 878-244-0783" and the second text message, received only seconds later, stated "Call her pops".

About one minute later, ADAMS/TT4 called Amber/878-244-0783. After asking "who is this?" and being informed "Amber," ADAMS told Amber that "B gave me your number. He said call you." Shortly thereafter, ADAMS asked Amber what drugs she wanted to buy – "what did you wanna get?" Amber answered that she wanted two different to-be-determined drugs and explained that she was recruiting another customer for the DTO – "A half of each but can I pay 30 for it this time. And I swear like I'll prove it to you, like I'm turning somebody onto this. Like they want better shit." After hearing this from

Amber, ADAMS indicated that the DTO would supply Amber through B – "Aight, I'll call B."

The next day, June 18, ADAMS/TT4 exchanged a series of text messages with a male using a phone with number 724-496-9030, who will be referred to as "UM9030." The text messages revealed that B had arranged a drug deal (kind of drug to be determined) that was to be completed on that particular day by ADAMS.  UM9030 texted, "Yo, B told me to call. I'm in a car and can't talk though. Is it okay if I text what I needed?"  ADAMS replied with texts informing UM9030 where to travel to for the drug deal and asking what kind of car UM9030 was in – "3505 west Pittsburgh road" and "I'm I the very first apartment I'm gonna be looking out what are you in".  UM9030 answered with a text informing ADAMS when he would be there, what kind of car he would arrive in, and that the driver was not aware of the drug deal that was about to happen – "Okay, I'm on the way now. I'll be about 16 minutes. I'm in an Avenger, but I have a driver that doesn't know what I'm doing so I'll have to jump out. I didn't know if he mentioned that."  ADAMS answered with texts informing UM9030 that he could enter the building – "Yeah you can come in" and "It's the first building the door is open last door on the right".  UM9030 thereafter texted ADAMS that he had arrived to do the deal – "Okay, here".

### 6.    Interceptions in Late June 2024

On June 22, during the afternoon, HIGGINBOTHAM/TT5 exchanged calls with Jermaine LETT who was using a phone with number 734-742-9050.  The immediate purpose of the calls was to determine where HIGGINBOTHAM and LETT were going to meet at that time.  At 2:59 p.m., LETT called HIGGINBOTHAM/TT5 and they confirmed

that they would meet at the house of a particular female.  LETT stated, "Uh comin' over girl house?"  HIGGINBOTHAM agreed to meet there – "That's cool."

One hour later, at 3:59 p.m., Dedric HIGGINBOTHAM/TT5 spoke with DAVIS, who was using number 313-774-7554.  HIGGINBOTHAM got right to the point during the brief conversation, referencing a high-volume fentanyl supplier, likely LETT, and informing DAVIS that HIGGINBOTHAM was bringing a quantity of fentanyl for DAVIS to have tested by their customers – "Man, nigga talkin' about he got bricks of that fetty man, I about to bring you a tester down we got be on it though bro, we gotta be on it."  DAVIS agreed to focus on getting the fentanyl tested as soon as possible – "Nigga I got to be all on this shit."  HIGGINBOTHAM then reiterated that he was on his way to DAVIS with the fentanyl to be tested – "That's what I'm alright so I'm on my way to ya to bring it."

About 13 minutes later, HIGGINBOTHAM/TT5 called DAVIS to discuss where to meet to transfer the fentanyl from HIGGINBOTHAM to DAVIS.  HIGGINBOTHAM stated, "Yo you wanna meet me in the hood?"  DAVIS agreed to meet at that location – "In the hood yeah I'm ah I meet over der."

About an hour later, DAVIS called HIGGINBOTHAM and conveyed a negative report from some of their customers on the quality of the fentanyl mixture.  DAVIS stated, "Yo man they talkin' 'bout they don't feel shit."  After HIGGINBOTHAM replied, "Ah Huh?", DAVIS elaborated – "They don't feel they talkin' bout some flour or some sugar in there man."  HIGGINBOTHAM then said that the supplier "talkin' they got bricks of that shit" – referring to kilograms of fentanyl.

On June 25, HIGGINBOTHAM/TT5 called LETT/x9050 and engaged in a conversation further revealing that their meeting on June 22 at a particular female's house

was related to drug trafficking. During the June 25 call, HIGGINBOTHAM stated, "You ain't got no young niggas to take down there?" – asking if LETT had any young people who could re-locate to New Castle to work HIGGINBOTHAM's traphouses. LETT could not think of a good candidate at that particular moment in time – "Ugh, damn, ugh, I got to think about it. Not right off the rip."

Thereafter, during the same call, HIGGINBOTHAM asked, "Did you talk to girly?" – referring to speaking to a particular female, likely about securing a supply of fentanyl. LETT did not state that he had contacted the female, but did state that he was thinking about doing so – "I was thinking about that U/I yeah." HIGGINBOTHAM then emphasized that they were ready to do a big drug deal, stating "We ready baby" and then stating "We need a major move baby. So, we both can get out of this shit." LETT agreed, "Right, right. Ok." LETT also agreed to call the female – "Ok. let me make a couple calls and see whats up."

Later that same day, LETT called HIGGINBOTHAM/TT5 and indicated that he spoke with the female as requested earlier that day. HIGGINBOTHAM asked if she was willing to do the drug deal – "she's wid it?" LETT confirmed that she was willing to do the drug deal, stating that she is "ready, set, go." HIGGINBOTHAM and LETT then discussed meeting up that day.

Two days later, on June 27, HIGGINBOTHAM/TT5 received another call from LETT/x9050. During the conversation that followed, LETT and HIGGINBOTHAM discussed a female who LETT was going to give money to, likely to secure a supply of fentanyl. Near the beginning of the call, LETT stated, "Trying to get this shit together" and "baby girl will be there about, about 12, 1 o'clock." HIGGINBOTHAM asked for

clarification, "she'll be what?", and LETT stated, "she'll be here today. Gonna give her that money so she can start makin' it, get her ahh, stuff together."

On June 29, HIGGINBOTHAM/TT5 made an outgoing call to DAVIS/x7554 to further discuss the quality of narcotics the DTO had recently been obtaining and HIGGINBOTHAM's intention to meet with a narcotics source of supply. DAVIS sated, "It's on the low low fo' 4 months now," and HIGGINBOTHAM responded, "It's cool, it's cool. We'll be good. We gon' be back right," suggesting that HIGGINBOTHAM had a plan to procure higher quality narcotics. HIGGINBOTHAM then affirmed his intent to meet with a narcotics source of supply – "I'm gonna ride down there see what's popping man, fuck it." DAVIS responded by emphasizing the recent deterioration of the quality of their narcotics that was resulting in a loss of customers – "When the shit was good everybody was flocking to us. Man what happened?"

As the conversation continued, HIGGINBOTHAM made reference to the kilogram quantities of narcotics being of poor quality, "bricks down here and that shit is straight up garbage." DAVIS agreed, theorizing that part of the problem may be narcotics traffickers adding too much cut to the narcotics to increase volume – "prolly try to hit it too much." HIGGINBOTHAM opined that the narcotics were of poor quality to begin with, "Man I think them bitches coming fucked up bro!"

HIGGINBOTHAM and DAVIS then discussed the origins of fentanyl. DAVIS informed HIGGINBOTHAM, "that's what the custo told me yesterday, man he's like, I thought y'all was getting that shit from China. I'm like what!" HIGGINBOTHAM confirmed, "Yeah that's where that shit come from dog. That fetty!", and "unless you get one of the Mexicans that got the, that had the original shit." HIGGINBOTHAM then

informed DAVIS with respect to the fentanyl, "my man said he got it, he said he, said he

got it, he just can't, he just said nobody wants to drive it back." HIGGINBOTHAM then

informed DAVIS, "I'm about to go down there tomorrow man, Monday, fuck that."

### 7.      July 2024 Arizona Fentanyl Supply Trip

Calls intercepted over TT5/HIGGINBOTHAM AND TT1/Devail ADAMS during

the first half of July 2024, combined with other investigative steps, revealed that Dedric

HIGGINBOTHAM and Jermaine LETT traveled to Arizona, secured a large supply of

fentanyl, and were thereafter waiting for the fentanyl to be transported to Detroit. On July

4, HIGGINBOTHAM/TT5 and LETT/x9050 called each other several times and discussed

flying to Arizona as soon as possible. HIGGINBOTHAM stated, "We gotta go today. We

out." Lett replied, "Hell yeah shit. I'm trying to see what's up." HIGGINBOTHAM then

said "Alright I'm with the shit man."

Later that day, an unsuccessful attempt was made to purchase airline tickets for

them in cash. A successful non-cash purchase of the tickets was then made, further

confirming their identities. They then flew from Detroit to Arizona early the next morning.

HIGGINBOTHAM's TT5 was conspicuously off from July 5 to July 8 while he

was in Arizona. No communications were intercepted and no GPS/E911 location data was

received for the phone during that time period. It is believed that HIGGINBOTHAM

turned TT5 off while he was in Arizona to thwart law enforcement surveillance.

Fortunately, HIGGINBOTHAM used his other cell phone, with number 313-721-

2306, to communicate with ADAMS/TT1 on July 6 while HIGGINBOTHAM was in

Arizona. It appears that HIGGINBOTHAM considers the x2306 phone to be his personal

phone (i.e., not his drug trafficking phone). He must have the number for ADAMS/TT1

saved in the x2306 phone, and not in TT5, because he has consistently used the x2306 phone to call ADAMS/TT1 to discuss drug trafficking.

During the July 6 call between HIGGINBOTHAM/x2306 and ADAMS/TT1, they had the following exchange further revealing that HIGGINBOTHAM was on a business trip to secure a supply for the DTO, the business of the trip was going well, and he would be back in Detroit early the following week:

DA: Aw there ain't nothin' to it, just checkin' on you.
DH: Out here in the desert baby (laughter).
DA: U/I Beautiful. I know the sun prolly shinin'!
DH: Man it's 115 down here.
DA: Ah man, you don't even got, ain't no, ain't no uhh (to someone in the background: the other way) ain't no, ain't no U/I that you headed to for water or some shit like that?
DH: Man, out here, I'm standin' on business. (laughter)
DA: Oh yeah, shit you ain't got U/I f'sho. Alright U/I.
DH: I'm standin' on business, dog.
DA: (laughter)
DH: I'm on real stuff.
DA: That's what's up.
DH: Whatchu doin'?
DA: Uhh out here messin' with the kids in this pool.
DH: Oh alright, chillin' chillin'. So I should be back Monday, man, so.
DA: Ok.
DH: Ain't nothin' but good news, we ready.
DA: Yep yep f'sho f'sho.

HIGGINBOTHAM and LETT were back in Detroit during the morning of July 9. HIGGINBOTHAM turned TT5 back on and used it to exchange communications with not only LETT but two other Detroit-based members of the DTO, Roy BROWN and Tyrone DAVIS.  As further detailed below, HIGGINBOTHAM was observed meeting up with DAVIS on July 9 at the **Linnhurst St Location**, likely to discuss the Arizona trip and their plans for when the fentanyl supply arrived in Detroit.

Also on July 9, HIGGINBOTHAM/x2306 called ADAMS/TT1 and told ADAMS that he was back in Detroit and would now be waiting for the fentanyl supply to arrive. HIGGINBOTHAM stated, "I jus' got back and I'ma have ta wait, I'm waitin' around. So I'll call ya in the morning."  ADAMS replied, "Ok."

The next day, July 10, HIGGINBOTHAM/TT5 called Roy BROWN and confirmed that the DTO was in the waiting stage – i.e., waiting for the fentanyl supply to be transported, likely across the U.S./Mexico border to Detroit (and then part of it to New Castle).  BROWN asked, "Still on the waitin' biz huh?"  HIGGINBOTHAM answered optimistically, "U/I it's coming baby."

### 8.    Interceptions during the Second Half of July 2024

Multiple calls intercepted on July 16 provided additional details on the inner workings of the DTO. For instance, during one call between Dedric HIGGINBOTHAM/TT5 and Tyrone DAVIS/x7554, DAVIS tallied the dollar amount owed to HIGGINBOTHAM for previous narcotics received, "Man I ain't got nothing homie. I'm talking about all together man, I'm a owe you 1,100 from the low low, and 1,200 from the girly. That's 23,000 dog!" HIGGINBOTHAM replied, "God damn. Alright man, let me call back," as DAVIS explained, "I'm keepin' it real, that's what I'm telling you. That's what I owe you dog."

On the same day, an intercepted call between HIGGINBOTHAM/TT5 and FRIERSON/TT2 exposed that FRIERSON's local drug trafficking crew needed an immediate re-supply. FRIERSON informed HIGGINBOTHAM, "man, we need you, shit man. For real, for real. It's, we gotta get this shit on a roll for real man." FRIERSON then expressed his concerns that rival drug dealers were in the process of taking over the DTO's

customers due to a lack of product, "motherfucker trying to infiltrate type shit man." HIGGINBOTHAM confirmed, "somebody trying to take over this bitch." FRIERSON further articulated his worries about the rival drug crew, "they've been dropping the prices and all kind of shit," and the DTO's need for high-quality narcotics at a low price, "we got to get that fire on the floor man."

HIGGINBOTHAM then relayed, "I'm waiting on the Diablo man," which I believe is a reference to the Arizona supply that HIGGINBOTHAM and LETT recently traveled to secure. FRIERSON responded, "hell yeah," and HIGGINBOTHAM told him, "it's coming though, for sure," meaning the bulk narcotics were in the process of being delivered to HIGGINBOTHAM. Toward the end of the call, FRIERSON informed HIGGINBOTHAM that his father, ADAMS, was on the way to Detroit with the intent of obtaining a re-supply of cocaine, "Pops said he's probably going to try to slide down there shit. Cause shit, we need that little momma for real." HIGGINBOTHAM responded, "well you need to tell him to slide on down right quick" – confirming that he had bulk cocaine to supply to ADAMS.

GPS/E911 location data on ADAMS/TT1 telephone revealed that, on July 17, ADAMS departed the WD/PA and arrived in Detroit. At approximately 10:27 AM, HIGGINBOTHAM, using number 313-721-2306, called ADAMS/TT1. ADAMS confirmed he had arrived in Detroit, "Ok, I was at the crib." HIGGINBOTHAM then informed ADAMS as to the status of the cocaine re-supply discussed between FRIERSON and HIGGINBOTHAM the day before, "I had it put up for y'all. They might have sold that bitch, but alright, but I'll see in one second."

At approximately 10:43 AM that day, HIGGINBOTHAM/TT5 called LETT/x9050 to inform him of the need to obtain narcotics, "I'm tryin to make something happen man." LETT responded, "uh we need to run into each other real quick," and HIGGINBOTHAM asked, "where you at, the crib?" LETT confirmed, "yea, I'm at the crib", i.e.- **the Salisbury St Location**, and HIGGINBOTHAM confirmed, "I'll meet you there."

At approximately 11:36 AM that day, HIGGINBOTHAM called ADAMS to inform ADAMS that he was at ADAMS's 8183 Helen St address in the Detroit area, "Open the door." Around the same time, GPS/E911 location data for ADAMS's and HIGGINBOTHAM's phones revealed that they were in the vicinity of the 8183 Helen St address. Then, at 11:46 AM, HIGGINBOTHAM's phone located on Sebastian Drive near the **Sebastian Dr Location**. I believe HIGGINBOTHAM met with ADAMS in person to discuss the details of the cocaine re-supply and then traveled directly to the **Sebastian Dr Location** to pick up the cocaine, before meeting with LETT.

At approximately 12:16 PM that day, HIGGINBOTHAM called LETT and stated "I'm out here." GPS/E911 location data for HIGGINBOTHAM's phone confirmed he was located at the **Salisbury St Location** (i.e., LETT's residence). LETT was not there at that moment as he stated, "Ok, I went around the corner. I'll be right back." HIGGINBOTHAM then said, "I'ma shoot to Mr. C's, get a carwash." At approximately 12:36 PM, HIGGINBOTHAM's phone pinged back at the **Salisbury St Location**. GPS/E911 location data for the phones belonging to HIGGINBOTHAM and LETT then showed their travel to an unknown location southwest of Detroit.

On July 21, HIGGINBOHAM/TT5 called Tyrone DAVIS/7554 and informed him, "I gonna be calling you man, I got sumptin' goin' boy, I'll call ya in a couple days!" DAVIS

asked him to repeat what he said, and HIGGINBOTHAM told him, "I'll call ya in a couple days" – likely referring to the pending arrival of the re-supply of narcotics that was secured through the Arizona trip earlier in July.  DAVIS acknowledged, "yeah man," and told HIGGINBOTHAM, "damn, that's my bad U/I. That shit won't happen again" – referring to the mistake DAVIS made that resulted in him owing over $20,000 of drug trafficking proceeds to the DTO. HIGGINBOTHAM replied, "Man, you should never drop no ball like that bro!"

Subsequent intercepted calls revealed that HIGGINBOTHAM not only obtained a re-supply of fentanyl, but he is also in the process of determining its potency through reviews from drug users. On July 23, HIGGINBOTHAM/TT5 called DAVIS/x7554 to discuss feedback from their drug customers on the recently obtained fentanyl. DAVIS informed HIGGINBOTHAM that DAVIS provided the fentanyl to drug users and he was receiving some negative feedback, "Man, shit, it ain't doing well. I'm giving it to the shooters now. The snorters saying man, shit, it ain't nothing special." DAVIS's comments are in reference to drug users who snort fentanyl and those who choose to intravenously use the narcotic.

Less than 30 seconds after the call with DAVIS ended, HIGGINBOTHAM/TT5 called LETT/x9050 requesting the same type of information, "What your man say?" LETT provided a specific rating as a result of the drug user review based on how they cut the fentanyl, "how we had it, they gave it, they like it actually. We gave it like seven, seven and a half." Although LETT seemed pleased with the result, HIGGINBOTHAM made it clear that he wanted higher potency, "that ain't what we looking for man," and "we need nitro glycerin," meaning HIGGINBOTHAM wanted the fentanyl to be stronger.

Less than 15 minutes later, HIGGINBOTHAM called LETT again and further emphasized his thoughts on the previous conversation, "that ain't the reading I want." HIGGINBOTHAM took it even further, indicating that he wanted to see drug users overdose on the product indicating it's high potency, "I want to see somebody go down bro." LETT agreed, "Yep."

The next day, on July 24, FRIERSON/TT2 communicated with HIGGINBOTHAM/TT5, who was keeping FRIERSON apprised of the status of the fentanyl, "I'ma have dat for you man. I'ma have dat for you soon man. I've been, I've been testin' em out. We gettin' closer and closer baby!" HIGGINBOTHAM then stated, "They just sent a couple good ass samples, but I, I, I'm still wit, I want that, that bad mothafucka bro!" Here HIGGINBOTHAM is referring to the fentanyl previously tested with drug users and expressing his desire for something even stronger. FRIERSON responded, "hell yeah, definitely."

HIGGINBOTHAM then informed FRIERSON, "They dilutin' that shit now. You can go down there, your, that shit gonna be diluted," referencing a lower quality narcotic that had been cut with too much additional powder. HIGGINBOTHAM continued, "but in a minute, I guarantee you, I'll be comin' to see you in a minute, so just, don't make no drastic, no more drastic moves dog!" I believe HIGGINBOTHAM was making sure that FRIERSON knew he would soon have highly potent fentanyl available for distribution. Additionally, I believe HIGGINBOTHAM was concerned that FRIERSON may have been considering alternate sources of supply and HIGGINBOTHAM wanted to re-affirm that he (HIGGINBOTHAM) would soon be in position to supply FRIERSON with the fentanyl he was looking for.

F.      **Search Locations**

1.      **1105 Highland Ave, Apt 1, New Castle, PA / "Highland Ave Location"**

The **Highland Ave Location** is Christian FRIERSON's residence in the WD/PA. GPS/E911 location data for FRIERSON's TT2 cell phone has been obtained approximately every 15 minutes for the last few months.  The TT2 location data confirms that not only is FRIERSON residing in New Castle, with occasional trips to Detroit, but that he is residing at the **Highland Ave Location**.  The TT2 location data places FRIERSON at the **Highland Ave Location** on a nightly basis for months.

Additionally, a vehicle tracking device was previously placed on FRIERSON's Kia Carnival via a judicial warrant.  FRIERSON has been observed by surveillance operating the Kia Carnival on many occasions in 2023 and 2024.  Until FRIERSON stopped using the Kia Carnival in the last few months and transferred it to a vehicle repair shop, the location data for the Kia Carnival showed that it was often parked behind the **Highland Ave Location**.

In addition, a mail cover for the **Highland Ave Location** was implemented in 2024. The mail cover confirmed that Gabrielle MCKNIGHT receives mail at the **Highland Ave Location**.  Investigators know MCKNIGHT to be the mother of one of FRIERSON's children.

Furthermore, as noted above, on June 8, 2024,  physical surveillance resulted in the observation of FRIERSON and HIGGINBOTHAM meeting near a convenience store in New Castle.   They then traveled in their vehicles away from the convenience store

ultimately arriving at the **Highland Ave Location**.  Physical surveillance was thereafter terminated to avoid being spotted by HIGGINBOTHAM and/or FRIERSON.

For approximately the last month, FRIERSON has been operating a known rental vehicle.  This has been confirmed by physical surveillance.  Periodic physical surveillance during that time period has confirmed the vehicle's presence at the **Highland Ave Location** on several occasions, including during the second half of July 2024.

On July 18, FRIERSON/TT2 made an outgoing call to Patrick HICKS, who was using number 267-474-2485. Law enforcement involved in this investigation know HICKS to have a criminal history involving drug trafficking. During the call, HICKS asked, "I didn't know if you was home, or?" FRIERSON responded, "yeah, I'm home," meaning the **Highland Ave Location**.

HICKS then made a reference to him owing FRIERSON a debt and wanting to reduce it in person because he was nearby, "I was going to come through and hopefully knock some of that, I'm just, I'm on Highland Avenue." HICKS then refined his current location to reflect being near a local gas station, "Jefferson where ah, BP is at." FRIERSON confirmed his presence at the **Highland Ave Location**, "I'm over at the house"; HICKS responded, "alright, so just come to the house?"; and FRIERSON confirmed, "yeah." GPS/E911 location data for FRIERSON's TT2 phone located it in the vicinity of the **Highland Ave Location** at that time. Approximately 25 minutes after the call, physical surveillance was established at the **Highland Ave Location** and observed FRIERSON to be present.

   **2.**   **219 E Lincoln Ave, Top Unit, New Castle, PA / "E Lincoln Top Location"**

The **E Lincoln Top Location** is the residence of Devail ADAMS and Kiara JONES in the WD/PA. GPS/E911 location data for ADAMS's TT1 cell phone has been obtained approximately every 15 minutes for the last few months. The TT1 location data confirms that not only is ADAMS residing in New Castle, with occasional trips to Detroit, but that he is residing at the **E Lincoln Top Location**. The TT1 location data places ADAMS at the **E Lincoln Top Location** on a nightly basis for months.

A surveillance camera has been mounted near the **E Lincoln Top Location** between May 2024 and the present. The surveillance camera has shown ADAMS to be at the **E Lincoln Top Location** on a daily basis except for his occasional trips to Detroit. The surveillance camera has also shown Kiara JONES to be there on a regular basis as well as several other members of the DTO, including Christian FRIERSON and George WYATT.

On June 17, the surveillance camera captured George WYATT arriving at the residence in the **Hyundai Genesis** previously discussed. GPS/E911 location data for WYATT's TT6 cell phone, obtained via a judicial warrant, confirmed that WYATT had departed Detroit earlier that day and was just arriving in the New Castle area. After parking the vehicle, WYATT was observed moving toward the front of the **Hyundai Genesis** and opening the hood. Shortly thereafter, WYATT bent over and appeared to clutch something that was obtained from under the hood. WYATT was then observed tucking the unknown item under his shirt before closing the hood and entering the **E Lincoln Top Location**.

After approximately 30 minutes inside, WYATT exited the **E Lincoln Top Location** and could be seen holding a clear plastic baggie containing a white substance. Once again, WYATT approached the front of the vehicle, opened the hood, and then

reached for an area under the hood that was in close proximity to where he originally obtained the prior item from. As WYATT closed the hood, he was no longer in possession of the clear plastic baggie. Based on my training, current knowledge, and experience, I believe WYATT was using the engine compartment of the vehicle for the purpose of concealing yet-to-be-determined narcotics.

On July 7, 2024, ADAMS/TT1 made an outgoing call to Daniel RASNICK who was using number 724-698-3084. During the beginning of the call, ADAMS informed RASNICK that a narcotics customer needed a quantity of an unidentified narcotic, "My man wants 15, them ahh, blue thangs," in reference to the color of the pill. RASNICK informed ADAMS, "Ahh, I think the door locked, I think the room locked," identifying a room inside the **E Lincoln Top Location** where the narcotics were being stored. ADAMS then responded, "I left you wit 22," and RASNICK replied, "Yeah I know, they on the table in your room," meaning ADAMS's bedroom at the **E Lincoln Top Location**.

The surveillance camera captured RASNICK exiting the area of the **E Lincoln Top Location** while talking on the phone during this call. RASNICK can then be heard on the call, and observed on the surveillance camera, knocking on the door of the **E Lincoln Bottom Location.** The call continued with ADAMS and RASNICK arguing about the narcotics that RASNICK was unable to obtain due to the door being locked. I believe RASNICK attempted to make contact with members of the DTO located in the **E Lincoln Bottom Location** to determine if they had an inventory of narcotics to meet the demands of ADAMS's customer.

The next day, on July 8, RASNICK was arrested by local law enforcement in New Castle, following his unsuccessful attempt to flee from police (first in a vehicle and then

on foot). Just prior to RASNICK's flight/arrest, the surveillance camera captured RASNICK and Joseph LARRY exiting the **E Lincoln Top Location** and entering a vehicle operated by LARRY. As RASNICK was attempting to run from the police, the surveillance camera captured him attempting to run back to the **E Lincoln Top Location** while holding what appeared to be a pistol.  As he continued to try to run from the police, he discarded a pistol as well as about 20 grams of cocaine that George WYATT had just supplied to him.

On July 8, shortly after RASNICK's arrest that day, WYATT/TT6 had a conversation with an unidentified male about the arrest of RASNICK, a/k/a "Caesar" and "Nephew."  WYATT stated, "Man listen, I give ma fuckin' Caesar zips right. Zips, zip of girl. Police pull him over, bruh he jumps out the car starts runnin' with the pistol and one of the zips, they got his ass, the pistol, and the zips."  It should be noted that "girl" is common code for cocaine and "zip" is common code for an ounce (i.e., 28 grams). During the same conversation, WYATT lamented about losing money as a result of recent law enforcement interventions.  WYATT stated, "Back to back to back to back man. Hit, hit, hit. You jus' can't count your money no more man."

On July 9, Kiara JONES called ADAMS/TT1 to discuss the inventory of narcotics at the **E Lincoln Top Location** after RASNICK's arrest the day before. During the beginning of the conversation, FRIERSON got on ADAMS's phone and asked JONES, "where is the shit at, that Danny had?" JONES replied, "there is some here and he got caught some," meaning the narcotics not seized by law enforcement remained at the **E Lincoln Top Location**.

As detailed above, on July 16 FRIERSON and HIGGINBOTHAM discussed HIGGINBOTHAM supplying cocaine to ADAMS, and then on July 17 ADAMS traveled

to Detroit to meet up with HIGGINBOTHAM and receive the cocaine re-supply from him. On July 19, intercepted communications over ADAMS/TT1 confirmed that ADAMS would be departing Detroit and traveling back to the WD/PA. GPS/E911 location data for ADAMS/TT1 and ADAMS/TT4 then confirmed ADAMS's return travel to New Castle from Detroit that day. At approximately 5:37 PM, the GPS/E911 location data placed ADAMS back in the area of the **E Lincoln Top Location**.

At approximately 7:37 PM that day, a call between ADAMS/TT4 and Marvis BROGDON was intercepted. BROGDON requested a quantity of narcotics, "tryin to get 20 of those." ADAMS informed BROGDON, "I'm on the north," meaning he was located at the **E Lincoln Top Location** which is north of downtown New Castle. ADAMS then told BROGDON "just call me when you get close" to complete the narcotics transaction.

I believe ADAMS brought the re-supply of cocaine directly back to the **E Lincoln Top Location** on July 19. Intercepted communications after he arrived back in New Castle on that date reveal that he possessed a supply of cocaine. Throughout the evening, ADAMS sent a mass text message out to his narcotics customers advertising his current price for cocaine a/k/a "girl," "Grams of girl 50".

### 3. 219 E Lincoln Ave, Bottom Unit, New Castle, PA / "E Lincoln Bottom Location"

The **E Lincoln Bottom Location** is Christopher BARTON's residence in the WD/PA. As noted above, BARTON has been convicted in Michigan in recent years for committing felony crimes. He was convicted in Michigan in 2018 for carrying a dangerous weapon with unlawful intent. He was convicted in Michigan in 2022 for carrying a

concealed weapon.  He was also convicted in another case in Michigan in 2022 for carrying a dangerous weapon with unlawful intent.

As detailed above, on February 7, 2024, a narcotics-related search warrant was served at 214 East Lutton Street, New Castle, PA. After the search of the residence, CS1 advised that at least two of the individuals who were inside 214 East Lutton Street when entry was made are members of the FRIERSON DTO who were selling controlled substances from the residence – i.e., Quinten JONES and Christopher BARTON.  CS1 has identified BARTON as someone who was dealing drugs at the time of the 214 East Lutton Street search and who was still dealing drugs following the search (BARTON was not arrested/charged at the time of the search).

After the search of 214 East Lutton Street, BARTON called the New Castle Police Department requesting the return of his social security card. At that time, BARTON provided his phone number as the (330) 760-1426 number. A case agent later communicated with BARTON directly over the (330) 760-1426 number to discuss the return of the social security card.

On May 11 ADAMS, using TT1, and Daniel RASNICK, using his 313-629-8916 number, had a conversation about the drug debt BARTON, a/k/a "Joker," owed to the DTO.  ADAMS told RASNICK "I'm tellin' ya, tell Joker man, put the pressure on Joker ass for that 140!" – directing RASNICK to attempt to get BARTON to pay what he owes. Shortly thereafter during the conversation, ADAMS stated, "I'm about to text him now too" – indicating that he intended to text BARTON in an attempt to get BARTON to pay up. Then, during the same conversation, ADAMS stated, "Hey, hey, Joker jus' text me, hey, hey, hey, he just text me back, he said how the fuck I suppose to pay, I broke as hell" –

referring to a reply text message ADAMS received from BARTON, after ADAMS texted

BARTON, and while ADAMS was still on the call with RASNICK.

As ADAMS was on the call with RASNICK, text messages to/from TT1 to/from

BARTON's 330-760-1426 number were intercepted.  The content of the text messages

corresponds with ADAMS's statements during the call with RASNICK.  ADAMS's texted

"You causing problems my friend...pat saying you owe 140" – directing BARTON's

attention to the debt he owes to the DTO.  BARTON then promptly replied to TT1 with

the text message "How TF I'm pose to pay em and I'm broke" – claiming that he did not

have the money to pay his debt to the DTO.  ADAMS then replied, using TT1, with the

text message "You still my manz though fr ....call pat ass" – providing encouragement

while also not letting BARTON off the hook for what he owes.  BARTON replied with a

text message containing an OK emoji.

On July 2, at about 8:48 AM, a call was intercepted between ADAMS/TT1 and

BARTON/x1426 during which they discussed BARTON working the traphouse at the

**Randolph St Location**, a/k/a "the bungalow" and "the coop."  After BARTON informed

ADAMS that he was ready to deal for the DTO that day, "Hell yeah, I'm up," ADAMS

replied, "Hey, umm, but Joker, I mean damn, Joker, I said Joker. Ugh, Juicy ass, you know

the one who got to get up though" – informing BARTON that they needed FRIERSON to

wake up to supply the narcotics for that particular day.

During the same conversation, BARTON asked ADAMS "where I'm a be at?" –

inquiring about which traphouse BARTON would be working that day.   ADAMS

answered, "Ugh, shit umm, shit, the bungalow really" – referring to the **Randolph St**

**Location**.  BARTON asked if the DTO had anyone else dealing from that traphouse at that

time, "Alright. Ain't nobody in there?"  ADAMS replied, "Yeah, what's his name in there right now. Umm, what's her name umm, Tamara, the little girl that ugh, that B used to be in there with B all the time" – referring to a female that was in that traphouse when Patrick BROWN, a/k/a "B," was dealing from there.  Near the end of the conversation, BARTON confirmed that he was ready to work the **Randolph St Location** for the DTO – "Alright, I'll hold it down."

The surveillance camera referenced above that covers the **E Lincoln Top Location** also covers the **E Lincoln Bottom Location** where BARTON resides.  Throughout July 2024, investigators have reviewed the surveillance camera footage.  They have confirmed that BARTON is residing at the **E Lincoln Bottom Location**.

On July 5, 2024, the surveillance camera captured BARTON holding what appeared to be a firearm while in a burgundy SUV he is known to operate. At approximately 4:10 PM, Joseph Larry, operating a light-colored SUV, and BARTON positioned their vehicles adjacent to each other in the rear lot of the **E Lincoln Bottom/Top Locations**. With the windows down, BARTON was seen holding a firearm while in the front driver's seat of the SUV. As LARRY departed, BARTON parked his SUV near the **E Lincoln Bottom Location** and met with someone in another vehicle that arrived in the lot. BARTON then returned to his SUV, appeared to retrieve unknown items, and entered the **E Lincoln Bottom Location**.

Once again, on July 16, the surveillance camera captured BARTON engaging in suspicious activity. At approximately 9:48 AM, a burgundy Ford sedan arrived and parked behind the **E Lincoln Bottom Location**. BARTON exited the front passenger seat of the vehicle and entered the **E Lincoln Bottom Location**. Less than one minute later, BARTON

exited the **E Lincoln Bottom Location** and appeared to be clutching/concealing an unknown item under his shirt while entering the Ford sedan. One minute later, BARTON exited the vehicle, while still appearing to be clutching the unknown item, and opened the rear driver's-side door of an adjacent SUV. BARTON appeared to place the unknown item in the backseat area of the SUV.

Continuing review of the surveillance camera continues to show BARTON and others frequently moving unidentified items between vehicles in the rear lot and between the **E Lincoln Bottom Location** itself. The surveillance camera in recent weeks has repeatedly captured people departing the **E Lincoln Bottom Location** in vehicles and almost immediately returning.  These observations are highly indicative of drug trafficking from the **E Lincoln Bottom Location** in light of my training and experience and the context provided by the results of the investigation detailed herein.

### 4.     912 Harrison St, New Castle, PA / "Harrison St Location"

The **Harrison St Location** is the residence of Jason GLASS in the WD/PA. As noted above, the Lawrence County Property Assessment Website, which has been demonstrated to be reliable in this and other investigations, lists Jason GLASS as the current owner of this location with a mailing address of 912 Harrison St, New Castle, PA 16101.  In addition, GLASS's Pennsylvania driver's license/PennDOT address is the **Harrison St Location**.

On May 10, 2024, there was an intercepted call between TT2/FRIERSON and GLASS, who was using a cell phone with number 724-498-8443. This was on outgoing call placed by FRIERSON.  He was attempting to purchase narcotics from GLASS to sustain his drug trafficking business while waiting for a resupply.

During the conversation, FRIERSON stated, "Um, ay man I need a little sumth'n." GLASS later replied, "I'm outta shit, bro, I'm like, it's, I'm at the end. I gotta get ready to go." FRIERSON replied, "Aww for real?", to which GLASS responded, "Yea, I'm like less than a motherfuck'n one. F'real." FRIERSON answered, "Damn, motherfucker," and GLASS replied, "Yea, it's on, I'm, I'm on my way about to slide." FRIERSON then stated, "If you don't let me know though, shit, 'cause I might have some shit on the way." Based on my training and experience, I believe GLASS was emphasizing that he was low on his narcotics inventory and needed to re-supply to take care of FRIERSON. Additionally, I believe FRIERSON knew he could find an alternate narcotics source of supply and potentially re-supply GLASS if he were to need it.

On July 13, 2024, there was another intercepted call between TT2/FRIERSON and GLASS/x8443. This was an incoming call placed by GLASS who wanted to purchase marijuana from FRIERSON. During the call, GLASS and FRIERSON discussed the risks associated with having marijuana in the vehicle when transporting large quantities of narcotics due to marijuana being easily detected by law enforcement.

At the beginning of the call, GLASS complained about the quality of marijuana he previously purchased from FRIERSON. GLASS stated, "And you get that shit from the D, I'm just scared to bring it back 'cause nigga I was holding some fire. I bought a zip and left it with my momma. I was scared." GLASS then stated, "I was bro, that shit crazy, I just rode back to this bitch with a half of brick and didn't want to ride with an ounce of weed" – meaning GLASS transported a bulk quantity of another kind of narcotic from Detroit and didn't want to bring marijuana along with it out of concern that it would expose him to additional risks because the smell of marijuana could be detected. FRIERSON replied,

"Hell yeah, it be like that," and GLASS re-affirmed his concerns, "It do for real. I told you I don't like having that shit together bro, I be like fuck that." FRIERSON then reiterated why the marijuana adds risk, "Yeah, that shit's too bulky and smelly." GLASS agreed, "And too smelly. That shit could fuck up everything, you feel me?" FRIERSON confirmed, "Yup," and GLASS reiterated, "Just having a little fuckin' uh, a little 7 grams in your pocket will fuck up the whole shit."

At the end of the call, FRIERSON agreed to sell GLASS marijuana. He asked GLASS where he was located to which GLASS replied, "home" – referring to the **Harrison St Location**. FRIERSON concluded the call, "I'm about to come that way."

Later the same day, a second call was intercepted between TT2/FRIERSON and GLASS/x8443. During the conversation, GLASS wanted to ensure that FRIERSON was coming to sell him the marijuana because GLASS was preparing to leave to complete another drug deal. FRIERSON reassured GLASS that he was nearby, "naw, I'm right here filling up, I had to get this gas." GLASS replied, "Yeah, I'm here though. I got to leave, she on her way to pick me up. I got to go to Wampum and hit a lick" – meaning GLASS was waiting for FRIERSON before leaving to go to Wampum to deal drugs.

Shortly after this second call concluded on July 13, 2024, physical surveillance was established around the **Harrison St Location**. Surveillance observed FRIERSON, who was operating his known rental vehicle, arrive and park in front of the **Harrison St Location**. FRIERSON exited the vehicle and entered the front door of the **Harrison St Location**. A few minutes later, surveillance observed FRIERSON exit the **Harrison St Location**, enter his rental vehicle, and drive away. Within minutes of FRIERSON leaving,

surveillance observed GLASS exit and enter the **Harrison St Location** multiple times before surveillance was terminated.

On July 16, 2024, a call was intercepted between TT2/FRIERSON and GLASS/x8443. This was an outgoing call placed by FRIERSON who wanted to purchase cocaine from GLASS. After greeting each other, FRIERSON asked, "What the hell you doing J Dog?" GLASS replied, "Just walked in the door, just sitting here really." FRIERSON replied, "let me get a gram of soft man," meaning he wanted cocaine.

After some arguing back and forth about the price GLASS wanted to charge FRIERSON, FRIERSON stated, "Come on man. 60 bucks, that's come on now, that's 1,400 a zip man, damn man. This nigga trying to squeeze a nigga blood out a nigga man." GLASS replied, "I still get 3,000 a zip!" – meaning he's selling ounces for $3,000. Later in the conversation, GLASS informed FRIERSON in regard to the prices he charges, "Bro, I have the whole time. Nigga, I been paying 500. I still do the same shit cause my clientele, how long I been here, nigga I'm telling you." Near the end of the conversation, FRIERSON told GLASS "I'm about to pull up dog" – referring to arriving at the **Harrison St Location** to do the cocaine deal there. GLASS replied, "Alright," and the call concluded.

On July 14, 2024, CS1 provided information regarding the relationship between FRIERSON and GLASS. CS1 indicated that GLASS and FRIERSON are alternate narcotics sources of supply for each other. CS1 advised that he/she has known FRIERSON to purchase narcotics from GLASS, and GLASS to purchase narcotics from FRIERSON.

     **5.**     **1222 Randolph St, New Castle, PA / "Randolph St Location"**

The **Randolph St Location** is the residence of Edward DIETRICH.  The Lawrence County Property Assessment Website, which has been demonstrated to be reliable in this and other investigations, lists Edward DIETRICH as one of the current owners of this location with a mailing address of 1222 Randolph St, New Castle, PA 16101.  As demonstrated throughout this affidavit, the **Randolph St Location** is one of the traphouse locations that the DTO has used to distribute narcotics from for the last several months. The DTO refers to it alternately as "the bungalow," "the coop," and as "Meatball's" place with "Meatball" being DIETRICH's streetname.

On some occasions, the DTO has directed customers to the **Randolph St Location** by literally providing the address to them.  For example, on July 5, 2024, Marvis BROGDON called Devail ADAMS/TT4 and expressed that he wanted to buy 30 fentanyl/oxycodone pills from the DTO – "I need, I need 30 of 'em."  ADAMS then placed a call to one of the DTO's drug dealers while BROGDON was still on the line with ADAMS.  ADAMS checked on where the drug dealer was selling from that day and confirmed that it was the **Randolph St Location**.  ADAMS then got back on the line with BROGDON and told him "Put 1222 Randolph in your navigation, man. It's gon' be like five minutes from where you at."  BROGDON replied, "Ok, 1222 Randolph," and ADAMS confirmed, "Randolph. Yep."

Physical surveillance has further confirmed the DTO's use of the **Randolph St Location** as a traphouse. On June 18, 2024, physical surveillance was conducted by investigators in the area of the **Randolph St Location**. The physical surveillance that occurred on June 18 resulted in the observation of multiple individuals going in and out of the residence, some of whom arrived and departed in a manner consistent with a narcotics

transaction.  It should be noted that the main residence and adjacent buildings on the property have multiple surveillance cameras. This is a common practice of narcotics traffickers who are using the cameras to not only protect their product and profits, but to also detect any law enforcement activity in the area.  Such cameras add to the difficulty of conducting physical surveillance at that location without getting spotted.

At one point during the surveillance, an unidentified male was observed rummaging through a bag located on the front porch of the **Randolph St Location** and pulling out what appeared to be a very small, clear, plastic baggie. The unknown male then entered the residence. Based on my training and experience, the small plastic baggie was consistent with the packaging of user-level quantities of narcotics.

As the surveillance continued, GEORGE WYATT's **Hyundai Genesis** was observed arriving and stopping in front of the **Randolph St Location**. An unidentified female exited the vehicle before loitering around the residence. As the vehicle started to depart the residence, it slowly drove down the road before making a U-turn and traveling back toward the residence. It parked on the opposite side of the street and WYATT exited the front driver's-side door of the vehicle.

As WYATT exited, two males from an unknown location appeared and began communicating with WYATT adjacent to the **Hyundai Genesis**. During the conversation, WYATT and the unidentified males seemed to be arguing and infrequently looking and pointing toward the **Randolph St location**. WYATT eventually returned to the **Hyundai Genesis** and departed the area.

Intercepted communications during the second half of July 2024 demonstrate that the DTO is still using the **Randolph Street Location** as a traphouse.  For example, on July

17, WYATT/TT6 received an incoming call from a female identified as UF9649 for the purpose of arranging a drug deal. Near the beginning of the call, UF9649 asked WYATT, "are you around?" WYATT confirmed, "I'll be at Meatball's in about 10 minutes" – referring to the **Randolph St Location**. UF9649 confirmed, "OK, I'll meet you up there."

UF9649 then asked, "are you gonna be at his house or the little?" WYATT thereafter responded, "I'll be in front, not the back," and UF9649 stated, "Alright, I'll leave now." As a result of the investigation, investigators know that the **Randolph St Location** consists of multiple buildings that are each used for the purpose of narcotics trafficking. A smaller building exists apart from the main residence that is primarily used to distribute narcotics from. During this July 17 call, WYATT is confirming he will be in the main residence and not the smaller building at the rear of the property.

Later during the same day, WYATT/TT6 received an incoming call from a male, identified as UM9828, who asked, "where you at now?" WYATT responded, "Meat – at the uh, the big house, in front of the little house." I believe WYATT was initially about to inform UM9828 that he was at "Meatball's" but stopped short, and instead described the **Randolph St Location**, specifically which building he was in. UM9828 then used coded language to request a quantity of unspecified narcotics, "could you prepare me, your nephew chuck, just one chucky, if chuck's around?" WYATT confirmed, "Yes," and UM9828 stated, "I'll see you in a few minutes, I mean literally like two minutes, I'm that close to you."

###        6.        1152 11th St, W Pittsburg, PA / "11th St Location"

The **11th St Location** is the residence of George WYATT in the WD/PA. GPS/E911 location data for WYATT's TT6 cell phone locates at the **11th St Location** on generally a

nightly basis when WYATT is in New Castle which is most of the time.  As detailed above, a New Castle Police Department investigation on December 20, 2023, involving, among other things, a neighbor dispute reflects that WYATT has been residing at the **11th St Location** as far back as December 2023.

Intercepted communications also confirm WYATT's residence at the **11th St Location**. For example, on July 4, WYATT/TT6 sent a text message to a narcotics customer reflecting WYATT's residence in West Pittsburg, which borders New Castle in Lawrence County, "I live in West Pittsburgh."  Later the same day, WYATT called the narcotics customer, referred to as UM5765, and asked, "how much did you want?" UM5765 responded by requesting a specific dollar amount of narcotics, "I don't know, 'bout 40." WYATT then told the customer to meet him near Joseph LARRY's house, "Meet me at JoJo's house. In front of JoJo's house," and indicated that he (WYATT) was leaving from the **11th St Location** to do the drug deal, "Ok I'm coming from West Pittsburg."

Later during the same day, WYATT/TT6 received an incoming call from another narcotics customer, referred to as UM9829, asking, "Can I stop down?" As the conversation continued, WYATT expressed concern in leaving the **11th St Location** for a narcotics transaction due to the presence of law enforcement, "You seen all them state boys and shit out there?" WYATT reinforced his concerns, "Yeah I just, scare me. I was down there, I got the fuck on. Shit I'm not even coming into town man. But I'm out here West Pittsburg." WYATT then provided specific instructions to the **11th St Location**, "I'm on 11th Street," "Um address 1155-52," correcting himself to specify the 1152, not 1155,

address for the **11th St Location**. UM9829 responded affirmatively, "Got it," and WYATT stated, "Yeah come on."

On July 8, at approximately 3:08 PM, WYATT/TT6 received an incoming call from a person referred to as UM8034, asking to meet to conduct a narcotics transaction, "uh can I come see you?" WYATT responded, "Yeah, come see me," and then provided specific instructions on where to go, "11th Street, you'll see ah, my car parked out front." At approximately 3:30 PM, UM8034 texted WYATT/TT6, "Pulling up," and one minute later texted, "Outside."

Similarly, on July 15, at approximately 4:14 PM, WYATT/TT6 received a call from another drug customer referred to as UM4212. During the call, UM4212 asked, "Are you able to meet real quick? I got the car." WYATT responded, "pull up to the crib, tell me what you want," and UM4212 responded, "a whole one," referring to a quantity of narcotics. UM4212 later asked, "where am I goin'," and WYATT responded, "On 11th. Make a right on 11th. You'll see my car."

On July 20, 2024, GPS/E911 location data for WYATT's TT6 cell phone confirmed that he departed the area of the **11th St Location** and traveled directly to Detroit, arriving at approximately 9:54 AM. Roughly 10 minutes later, WYATT's TT6 cell phone located briefly in close proximity to the **Pressler St Location**, before remaining in the Detroit area for the remainder of the day. During the overnight hours, WYATT's phone located in the immediate vicinity of the **Salisbury St Location**.

Just after 5:00 AM on July 21, 2024, WYATT's TT6 GPS/E911 location data revealed that he departed Detroit and traveled directly back to the **11th St Location**. Based on the results of the investigation, and my training and experience, I believe WYATT

departed the **11 St Location** on July 20 and traveled to Detroit for a narcotics re-supply. Additionally, I believe WYATT stopped at the **Pressler St Location** to check on his narcotics-related business there. I also believe WYATT traveled to the **Salisbury St Location** to meet with Jermaine LETT and/or his associates for the purpose of re-supplying his narcotics inventory before traveling back to the **11th St Location** with the narcotics the next morning.

On July 21, at approximately 10:19 AM, and while WYATT's TT6 cell phone was still locating near the **11th St Location**, WYATT received an incoming call from one of his narcotics customers. The customer asked what WYATT was doing, and he responded, "baggin' up this crack." The customer then asked for some crack cocaine, "can you bring me a little bit of hard," and WYATT responded, "I'll be at Meatball's shortly," meaning the **Randolph St Location**.

I believe WYATT returned from Detroit with a narcotics re-supply that included a re-supply of cocaine. I believe WYATT then processed the cocaine into crack while at the **11th St Location**. Once completed, I believe WYATT intended to bring the crack to the **Randolph St Location** so it could be distributed to customers.

At approximately 11:25 AM that same day, WYATT and the **Hyundai Genesis** were captured by the nearby surveillance camera arriving outside the **E Lincoln Top/Bottom Locations**. WYATT exited the **Hyundai Genesis** and then entered the **E Lincoln Top Location**. Roughly 10 minutes later, WYATT exited and departed in the **Hyundai Genesis**. I believe WYATT was meeting with Devail ADAMS to provide him with some of the recently processed crack cocaine inside the **E Lincoln Top Location**.

### 7.     626 Forrest St, New Castle, PA / "Forrest St Location"

The **Forrest St Location** is one of the DTO's traphouses in New Castle.   As demonstrated above, Patrick BROWN, a/k/a "B," is one of the DTO's drug dealers.   He has recently been residing at, and dealing drugs from, the **Forrest St Location**.

Recent intercepted communications demonstrate that both Devail ADAMS and George WYATT have been directing the DTO's drug customers to the **Forrest St Location**.   For example, on July 13, UF9336 sent a text message to Devail ADAMS/TT4 stating, "I should've grabbed before you left," meaning UF9336 should have obtained narcotics from ADAMS while they were co-located. A few hours later, UF9336 called ADAMS again inquiring about the availability to purchase narcotics, "you think you could come soon, or is anybody anywhere else? We go?" ADAMS directed UF9336 to the **Forrest St Location** where she could meet Patrick BROWN, a/k/a "B," for the narcotics, "Yeah, on Forrest, you can go on Forrest, over there an see B!" UF9336 complained, "Ah, that's too far for us," and ADAMS reiterated that the **Forrest St Location** was the only option at that particular moment in time, "that's the only one." On a separate call later that day, UF9336 asked again if ADAMS was coming, and he emphasized, "they over there on Forrest" and "they over Tracy's house." "Tracy" is a local woman who has allowed the **Forrest St Location** to be used as a traphouse for the DTO.

On the same day, July 13, ADAMS/TT4 communicated with another narcotics customer, referred to as UF8579, and sent her to the **Forrest St Location** for a narcotics transaction. UF8579 was specific in the narcotics she wanted, "20 of weed and 20 of the other." During a separate communication that day, UF8579 explained that she now had a ride and wanted to know where to go. ADAMS asked, "Do you know where Tracy live?", to which UF8579 responded "no." ADAMS then instructed UF8579 on where to go, "it's

over there by A+, on Forrest. I'ma send you the address." In yet another communication, ADAMS specifically provided "626 Forrest" as the location UF8579 needed to go to for the narcotics transaction that day.

On July 15, WYATT/TT6 received an incoming call from a woman who will be referred to as UF1081. Near the beginning of the call, UF1081 told WYATT about drug customers who wanted "boy" (i.e., fentanyl) and Xanax – "somebody needs some, some, some boy and they askin' if somebody got some xans." WYATT told UF1081 that he did not have Xanax to distribute, but he did have fentanyl at the DTO's **Forrest St Location** traphouse – "Oh. I ain't got no xan but I got boy at the trap. Uh, 626 Forrest." UF1081 replied, "Huh?", and WYATT repeated, "626 Forrest Street on the east side."

UF1081 then asked, "Is that where you goin'?" WYATT answered that he was not going there, but that is where he had fentanyl stored that could be supplied at that time – "That ain't where I'm goin', but that's where I got it at." Shortly thereafter, just before the end of the call, WYATT, a/k/a "Unc," told UF1081 to "just tell 'em Unc sent 'em" – directing UF1081 to tell the drug customers to tell the DTO's drug dealers working the **Forrest St Location** traphouse at that time that WYATT sent them to do a drug deal at that location.

On July 17, WYATT/TT6 communicated with a female, UF9649, who wanted to meet with him to purchase narcotics. UF9649 asked, "You still at Meatball's?" – referring to the **Randolph St Location** traphouse. WYATT informed UF9649, "no I'm gone for the night," and asked her, "do you know where the other house is at?" – asking her if she knew where the **Forrest St Location** traphouse was located. UF9649 responded, "No, which

one?", and WYATT stated, "It's uhh, 626 um, damn hold on." UF9649 asked, "is that

Forrest Street?", and WYATT confirmed, "Forrest yep!"

### 8.    8064 Pressler St, Detroit, MI / "Pressler St Location"

George WYATT uses the **Pressler St Location** in the ED/MI to further the

activities of the DTO, specifically to serve as a traphouse worked by some of the DTO's

Detroit-based drug dealers.  As detailed above, on July 20, 2024, GPS/E911 location data

for WYATT's TT6 cell phone confirmed that he departed the area of the **11th St Location**

in the WD/PA and traveled directly to Detroit, arriving at approximately 9:54 AM. Roughly

10 minutes later, WYATT's TT6 cell phone located briefly in close proximity to the

Pressler St Location.  As explained above, it is believed that WYATT traveled to Detroit

to re-supply with narcotics and went first to the **Pressler St Location** to check on its status.

Intercepted communications demonstrate the DTO's use of the **Pressler St**

**Location** to store and distribute narcotics from. For example, on May 16, FRIERSON/TT2

made an outgoing call to WYATT/TT6 who was in Detroit at the time. At the beginning

of the call, WYATT informed FRIERSON, "sittin' over here at the trap," meaning the

**Pressler St Location** traphouse. FRIERSON asked for clarification on the location, "what

block is it?", and WYATT responded, "Pressler, right off Van Dyke." Investigators know

that Van Dyke Avenue is the intersection to the west of the **Pressler St Location**.

On July 2, at approximately 12:17 PM, Devail ADAMS/TT4 received a phone call

from a female using telephone number 878-232-1356, referred to as UF1356. During the

conversation that followed, UF1356, who was in Detroit at the time, asked ADAMS about

obtaining a quantity of narcotics for a friend of UF1356 who was with her, "I gotta um, I

might have to try to find her something down here." ADAMS responded by explaining that

he would check with WYATT, a/k/a "Unc" and "G-Money," to hook them up with the narcotics, "Unc got something goin' on down here, lemme call him and then I'm gonna get y'all the address."

Approximately 15 minutes later, UF1356 called ADAMS/TT4 again, reiterating that her friend needed a quantity of narcotics before they traveled back to Pennsylvania, "I don't want her to be sick the whole way in my car." ADAMS responded, "hold on, let me call real fast," and UF1356 told him, "hurry up, 'cause we about to leave out." Roughly four minutes later, ADAMS/TT4 called UF1356 with instructions on where to go to be supplied with narcotics, "put this in yo ah thing," and provided specific directions to the **Pressler St Location**. After ADAMS provided the directions, UF1356 confirmed, "OK, 8064 Pressler St," and stated they were "13 minutes away."

ADAMS then told UF1356 to let the drug dealers working the **Pressler St Location** know that WYATT sent her, "just tell 'em that G-Money sent you." ADAMS then provided a description of the **Pressler St Location** to UF1356, "you gonna pull up in front of the house, it's gonna be a brick house." The **Pressler St Location** has a brick exterior. It should be noted that GPS/E911 location data for WYATT's TT6 cell phone and intercepted communications demonstrate that WYATT resides most of the time in New Castle but travels to/from Detroit multiple times per month. When located in Detroit, the cell phone location data often places him in the area of the **Pressler St Location**.

**9.     531 W Hildale Ave, Detroit, MI / "Hildale Ave Location" & 33661 Sebastian Ln Dr, Sterling Heights, MI / "Sebastian Dr Location"**

The **Hildale Ave Location** is the residence of Dedric HIGGINBOTHAM in the ED/MI.  HIGGINBOTHAM uses the **Sebastian Dr Location** to further the activities of

the DTO. These conclusions are based on the results of the investigation so far, including physical and electronic surveillance, as well as on my training and experience.

GPS/E911 location data for HIGGINBOTHAM's TT5 cell phone places HIGGINBOTHAM at the **Hildale Ave Location** on a nightly basis throughout the last approximately two months (i.e., the period of time during which location data has been received via a judicial warrant). Additionally, physical surveillance has routinely resulted in the observation of HIGGINBOTHAM and/or his vehicle, a Chrysler Pacifica bearing MI registration 8NQK51, at the **Hildale Ave Location** during the last approximately two months. For instance, on June 26, 2024, at approximately 8:21 AM, HIGGINBOTHAM's Pacifica was observed parked in the driveway of the **Hildale Ave Location**.

Roughly twenty minutes later, HIGGINBOTHAM and the Pacifica were located at Sound & Secure, a local business that sells vehicle alarms and radios. It should be noted that HIGGINBOTHAM arrived prior to the opening of the business that day. At 9:04 AM, HIGGINBOTHAM pulled the Pacifica into a work bay and the back hatch of the Pacifica was observed to be opened. Surveillance reported that HIGGINBOTHAM appeared to be gaining access to a subwoofer speaker located in the rear hatch before appearing to be exchanging pleasantries with an unidentified person located in the same area. At 9:14 AM, HIGGINBOTHAM re-entered the Pacifica and departed the business.

At approximately 9:43 AM, HIGGINBOTHAM arrived at the **Sebastian Dr Location,** backing the Chrysler Pacifica into the driveway as observed by surveillance. HIGGINBOTHAM briefly entered the **Sebastian Dr Location,** before returning to the Chrysler Pacifica and accessing the rear hatchback of the vehicle. At that point, surveillance observed HIGGINBOTHAM making multiple trips between the Pacifica and

the **Sebastian Dr Location.** At 9:52 AM, an unidentified female arrived at the **Sebastian Dr Location** in a Jeep Wrangler bearing MI registration 2NFU20. Database checks confirmed the vehicle was registered to Kandis Kahlil Hall at 12312 Wilshire, Detroit, MI. The unidentified female then entered the Pacifica with HIGGINBOTHAM and the vehicle departed.

Based on my training and experience, and the results of the investigation so far, I believe HIGGINBOTHAM departed the **Hildale Ave Location** on June 26, 2024, as detailed herein, and went to the Sound & Secure business for the purpose of securing items related to the operation of the DTO in the back hatch area of the Pacifica, prior to transporting them to the **Sebastian Dr Location**. Corroborating my belief is the fact that the HIGGINBOTHAM arrived before the business was open that day and surveillance did not observe any employees doing any type of work on the Pacifica. HIGGINBOTHAM was the only person observed accessing the hatch portion of the Pacifica. And he was only there for about 10 minutes which is less time than one would expect for legitimate vehicle-related work.

I know it is a common tactic of drug traffickers to utilize vehicle hides and/or traps as a means of concealing contraband from law enforcement. These locations are often found co-located with vehicle sound systems and/or in rear/trunk spaces of vehicles. On this occasion, I believe HIGGINBOTHAM was accessing a similar type of concealment location in the Pacifica to secure items related to the operation of the DTO prior to transporting those items to the **Sebastian Dr Location.**

On July 10, 2024, at approximately 7:50 AM, physical surveillance was established at the **Hildale Ave Location** where HIGGINBOTHAM's TT5 cell phone was locating and

the Chrysler Pacifica was parked in the driveway. At approximately 8:29 AM, HIGGINBOTHAM departed in the Pacifica and eventually arrived at the **Sebastian Dr Location** at approximately 9:20 AM. HIGGINBOTHAM remained there for only a short period of time before arriving at a Chase Bank drive thru at 9:55 AM.

HIGGINBOTHAM then departed the bank and traveled directly to the **Linnhurst St Location** where Tyrone DAVIS resides. After waiting approximately four minutes, Tyrone DAVIS was observed exiting the **Linnhurst St Location** and entering the Pacifica for approximately nine minutes. DAVIS then exited and re-entered the **Linnhurst St Location**. HIGGINBOTHAM then traveled to another local Detroit address where he remained for less than two minutes.  On this occasion, I believe HIGGINBOTHAM was meeting with co-conspirators, including DAVIS, in the privacy of his vehicle to discuss the operation of the DTO.

As detailed above, GPS/E911 location data for Devail ADAMS/TT1 cell phone, in conjunction with intercepted communications, revealed that, on July 17, 2024, he departed the WD/PA and arrived in Detroit for the purpose of re-supplying with cocaine from HIGGINBOTHAM. At approximately 10:27 AM, HIGGINBOTHAM, using number 313-721-2306, called ADAMS/TT1. ADAMS confirmed he had arrived in Detroit, "Ok, I was at the crib." HIGGINBOTHAM then informed ADAMS as to the status of the cocaine re-supply discussed between Christian FRIERSON and HIGGINBOTHAM the day before, "I had it put up for y'all. They might have sold that bitch, but alright, but I'll see in one second."

At approximately 11:36 AM that day, HIGGINBOTHAM called ADAMS to inform ADAMS that he was at ADAMS's 8183 Helen St address in the Detroit area, "Open

the door." Around the same time, GPS/E911 location data for ADAMS's and HIGGINBOTHAM's phones revealed that they were in the vicinity of the 8183 Helen St address. Then, at 11:46 AM, HIGGINBOTHAM's phone located on Sebastian Drive near the **Sebastian Dr Location**. I believe HIGGINBOTHAM met with ADAMS in person to discuss the details of the cocaine re-supply and then traveled directly to the **Sebastian Dr Location** to pick up the cocaine.  Also as detailed above, when ADAMS returned to New Castle on July 19, he possessed a supply of cocaine. Throughout the evening on that date, ADAMS sent a mass text message out to his narcotics customers advertising his current price for cocaine a/k/a "girl," "Grams of girl 50".

Communications intercepted during the week of July 22, 2024, further confirm HIGGINBOTHAM's association with the **Sebastian Dr Location**. For instance, during an intercepted call on July 22, HIGGINBOTHAM/TT5 informed a caller "Man, I got a house in Sterling Heights man, I wonder can you get, ever get out there to it? It's like 14 and Van Dyke." Investigators are aware that the closest major intersection to the **Sebastian Dr Location** is E 14 Mile Rd and Van Dyke Avenue. Additionally, on July 25, HIGGINBOTHAM followed up with the same caller and specifically provided him with the address for the **Sebastian Dr Location**, "33661 Sebastian Lane." When the caller asked what city the **Sebastian Dr Location** was in, HIGGINBOTHAM correctly responded, "Sterling Heights."

### 10.    19800 Salisbury St, St Clair Shores, MI / "Salisbury St Location"

The **Salisbury St Location** is the residence of Jermaine Lett in the ED/MI. GPS/E911 location data for LETT's x9050 cell phone has been received for approximately the last month.  The location data places LETT in the area of the **Salisbury**

**St Location** on a nightly basis corroborating his residence there.  The cell phone location data has corresponded with physical surveillance observations of LETT at the **Salisbury St Location** during that time period.

On July 4, 2024, at approximately 10:51 AM, HIGGINBOTHAM and his Chrysler Pacifica were observed by surveillance at the **Salisbury St Location**. Two minutes later, HIGGINBOTHAM and LETT departed the **Salisbury St Location** in the Pacifica and traveled directly to a Chase Bank. LETT exited the vehicle and walked to an ATM located at the bank. LETT returned to the vehicle which then eventually traveled back to the **Salisbury St Location**.

After arrival at the **Salisbury St Location**, LETT was observed removing items from a Chevy Equinox parked in the garage and entering the Pacifica roughly five minutes later with HIGGINBOTHAM still in it. The Pacifica then travelled directly to the Detroit Metro Airport. While at Detroit Metro, law enforcement was able to determine that LETT and HIGGINBOTHAM attempted to purchase flight tickets with cash only. After being denied by the airline, LETT and HIGGINBOTHAM departed the airport, returned approximately one hour later, and purchased airline tickets for travel to and from Phoenix, AZ, which, as detailed above, was for the purpose of securing a large supply of fentanyl for the DTO.

After completing the ticket purchase on July 4, LETT and HIGGINBOTHAM returned to the **Salisbury St Location.** On July 5, at approximately 6:00 AM, surveillance observed HIGGINBOTHAM picking up LETT at the **Salisbury St Location.** They traveled directly to Detroit Metro Airport to fly to Phoenix, AZ.

HIGGINBOTHAM and LETT returned to Detroit Metro Airport from Phoenix, AZ, on July 9 at approximately 5:45 AM. HIGGINBOTHAM and LETT were picked up by an unidentified driver in HIGGINBOTHAM's Pacifica and traveled directly to the **Salisbury St Location** where LETT was dropped off. HIGGINBOTHAM then traveled to the **Sebastian Dr Location**.

As detailed above, on July 17, 2024, Devail ADAMS traveled to Detroit to be supplied cocaine by HIGGINBOTHAM. At approximately 10:27 AM, HIGGINBOTHAM, using number 313-721-2306, called ADAMS/TT1. ADAMS confirmed he had arrived in Detroit, "Ok, I was at the crib." HIGGINBOTHAM then informed ADAMS as to the status of the cocaine re-supply discussed between FRIERSON and HIGGINBOTHAM the day before, "I had it put up for y'all. They might have sold that bitch, but alright, but I'll see in one second."

At approximately 10:43 AM that day, HIGGINBOTHAM/TT5 called LETT/x9050 to inform him of the need to obtain narcotics, "I'm tryin to make something happen man." LETT responded, "uh we need to run into each other real quick," and HIGGINBOTHAM asked, "where you at, the crib?" LETT confirmed, "yea, I'm at the crib", i.e.- **the Salisbury St Location**, and HIGGINBOTHAM confirmed, "I'll meet you there."

At approximately 12:16 PM that day, HIGGINBOTHAM called LETT and stated "I'm out here." GPS/E911 location data for HIGGINBOTHAM's phone confirmed he was located at the **Salisbury St Location** (i.e., LETT's residence). LETT was not there at that moment as he stated, "Ok, I went around the corner. I'll be right back." HIGGINBOTHAM then said, "I'ma shoot to Mr. C's, get a carwash." At approximately 12:36 PM, HIGGINBOTHAM's phone pinged back at the **Salisbury St Location**. GPS/E911 location

data for the phones belonging to HIGGINBOTHAM and LETT then showed their travel to an unknown location southwest of Detroit.

A DEA investigation of LETT in 2020 and 2021 further connects him to major drug trafficking, over an extended period of time, and to the **Salisbury St Location**. During the morning of August 5, 2020, investigators established surveillance at the **Salisbury St Location** in anticipation of LETT's involvement in the transfer of suspected drug proceeds to a known money courier. At approximately 1:00 PM, investigators observed LETT exit the **Salisbury St Location** with a black backpack and depart the area in a rental vehicle. At approximately 1:15 PM, at the direction of investigators, a traffic stop was conducted on LETT by a Roseville Police Department ("RPD") canine unit.

Upon approaching the vehicle, the RPD officer identified LETT as the driver and sole passenger of the vehicle. The RPD officer deployed his canine, who is trained in the detection of narcotic odor, and the canine positively alerted to the presence of narcotic odor on the passenger and driver's side door seams and on the black backpack located on the rear passenger seat of the vehicle. The RPD officer observed that the black backpack, which LETT was observed carrying out of the **Salisbury St Location**, contained a dark-colored, knotted shipping bag that contained wrapped bundles of U.S. currency, later determined to be $100,000.

On March 30, 2021, a search warrant was served at the **Salisbury St Location**. LETT was present at that time.  Service of the search warrant resulted in the discovery of several items of evidentiary value at the location, including safes, jewelry, multiple cell phones, multiple firearms and ammunition, and $339,572 in cash.

In April 2022, DEA and FBI agents utilized a confidential source to conduct a controlled narcotics delivery to LETT.  The CS was not one of the other confidential sources referenced herein.  The CS was a known (i.e., not anonymous) CS.  The CS's participation in the controlled narcotics delivery to LETT was corroborated by simultaneous physical surveillance as well as by a subsequent traffic stop and search of LETT's vehicle as detailed below.

Investigators provided the CS with five kilograms of "sham" cocaine to be exchanged for U.S. currency provided by LETT. Investigators established surveillance on the proposed meeting location and observed LETT's black Ford Taurus arrive in the area of the meeting location. LETT then met with the CS and was eventually observed returning to the Ford Taurus carrying a black backpack over his shoulder that contained the sham cocaine. LETT was then observed moving the sham cocaine into the front passenger-side airbag area. LETT then departed the meeting location.

An assisting law enforcement agency then initiated a traffic stop on LETT via a fully marked police vehicle. During the traffic stop, an officer obtained LETT's Michigan driver's license from him and confirmed it was LETT who was driving and was the sole occupant of the vehicle. The officer then asked LETT to step out of the vehicle.  After a brief conversation, LETT fled the scene in his vehicle. LETT's vehicle was eventually located abandoned that day. During an inventory of the vehicle, investigators located a hidden compartment in the front-passenger airbag compartment. Inside the hidden compartment, investigators located a Glock Model 22 handgun, loaded with a magazine, along with an additional magazine. The sham cocaine was not located in the vehicle.

**11.    14060 Linnhurst St, Detroit, MI / "Linnhurst St Location"**

The **Linnhurst St Location** is the residence of Tyrone DAVIS in the ED/MI. GPS/E911 location data for DAVIS's x7554 cell phone has been received for approximately the last month.  The location data places DAVIS in the area of the **Linnhurst St Location** generally on a nightly basis corroborating his residence there.  The cell phone location data has corresponded with physical surveillance observations of DAVIS at the **Linnhurst St Location** during that time period.

Documents from the Wayne County Register of Deeds show Elizabeth LUCAS as the current owner of the **Linnhurst St Location**. LUCAS's connection to DAVIS is established by, among other things, Michigan Department of Corrections ("MDOC") records.  On December 20, 2023, during a recorded jail communication, DAVIS informed an inmate housed within the MDOC system that he was sending the inmate approximately $100. Intelligence analysts with MDOC confirmed that on December 21, 2023, LUCAS deposited $100 to the inmate's account.

As detailed above, on July 9, 2024, Dedric HIGGINBOTHAM and Jermaine LETT arrived back in Detroit following their trip to Arizona to secure a large supply of fentanyl for the DTO. At approximately 9:43 AM on that date, HIGGINBOTHAM/TT5 received a call from DAVIS who was using his 313-774-7554 number. HIGGINBOTHAM informed DAVIS, "I'm bout to pull up on you."

At approximately 9:50 AM, surveillance observed HIGGINBOTHAM arrive at the **Linnhurst St Location** in his Pacifica. After approximately four minutes, surveillance captured DAVIS exiting the **Linnhurst St Location**. DAVIS entered the Pacifica and remained inside for approximately 19 minutes prior to returning to the **Linnhurst St Location**. The Pacifica then departed. I believe HIGGINBOTHAM and DAVIS met in the

privacy of HIGGINBOTHAM's vehicle to discuss the results of HIGGINBOTHAM's travel to/from Arizona and to plan for the eventual receipt of a bulk narcotics shipment.

As detailed above, on July 10, 2024, surveillance observed HIGGINBOTHAM once again travel to the **Linnhurst St Location**. After waiting approximately four minutes, DAVIS was observed exiting the **Linnhurst St Location** and entering the Pacifica for approximately nine minutes. DAVIS then exited and re-entered the **Linnhurst St Location**.

At 10:52 AM that day, DAVIS was observed exiting the **Linnhurst St Location** with a female matching the description of Elizabeth LUCAS. DAVIS and LUCAS entered a grey Jeep Cherokee and traveled to a dry cleaner before arriving at 19355 Alcoy St, Detroit, MI, an address that has independently been associated with LUCAS. After 15 minutes, DAVIS drove back to the **Linnhurst St Location** and was observed carrying a bag into the residence at approximately 11:15 AM.

_s/Ryan J. Chrobak_
Ryan J. Chrobak
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me, by telephone
pursuant to Fed.R.Crim.P. 4.1(b)(2)(A),
this 30th day of July 2024.

_____
HONORABLE MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE